## INTERNATIONAL PAPER CO. v. DELAWARE & H. R. CORPORATION.

### No. 2418.

District Court, N. D. New York.
Nov. 21, 1938.

Arthur L. Winn Jr., and Frederick E. Brown, both of Washington, D. C., and Seymour Ellenbogen, of Albany, N. Y., for plaintiff.

Joseph Rosch, of Albany, N. Y. (Carlton W. Myers, of New York City, Daniel T. Loomis, of Albany, N. Y., and Thomas L. Ennis, of New York City, of counsel), for defendant.

COOPER, District Judge.

This is a suit brought pursuant to Section 16(2) of the Interstate Commerce Act, 49 U.S.C.A. § 16(2), to recover a sum of money which the Interstate Commerce Commission by order directed the defendant to pay to plaintiff.

The Commission held that the defendant collected from the plaintiff more money than was permissible under its freight tariff and directed the defendant to pay to plaintiff the overcharge.

The defendant asserts that there was no overcharge under a proper construction of this freight tariff and the law applicable thereto and that in any event the commission directed the defendant to pay interest at a rate of 6% which, the defendant asserts, is a greater rate than should have been allowed.

It is agreed that if there was any overcharge the amount is $29,206.33.

It is also agreed that the shipments upon which the overcharge is alleged to have been made cover a period of 19 months from June 1932 to the 29th day of December, 1933.

It is further agreed that interest, if allowed at the rate of 6%, amounts to $7237.-22 to April 15, 1937.

A jury trial was waived.

The evidence consists of the record before the Interstate Commerce Commission, the decisions and orders of the Commission, petition by defendant for reargument, a letter by one of defendant's counsel to the Chief Examiner of the Interstate Commerce Commission, the petition to the I. C. C. for hearing before the whole Commission and the order of the Commission thereon and a certified copy of the Commission's Tariff Circular No. 20, Rules to govern the construction and filing of Freight Tariffs. Defendant objected to some of this evidence.

This case turns upon the consideration of the provisions of Rule 1 of Defendant's Tariff, I. C. C. No. 13870, relating to the minimum freight revenue for switching absorption purposes at Albany.

The defendant's line haul tariff provided a rate of $1 per ton for shipments of pulp wood from Waterline to destinations on defendant's railroad and applied to the petitioner's shipments herein which were transported to Corinth, N. Y.

The defendant's line rate had been reduced from $1.13 per net ton to $1 per net ton at plaintiff's special request by reason of the volume of its freight. The normal rate permitting switching absorption was or had been $1.30 per net ton.

The terms of I. C. C. 13870 provided for absorption of connecting line switching charges of $5 under certain conditions named applicable at stations on the D. & H. Railroad Corporation named therein.

It contains this:

General Application of Rule 1 to 14 Inclusive:

"Except as otherwise specified herein and in the tariffs naming rates to and from points herein shown, the switching charges as published in tariffs of switching carriers lawfully on file * * * applicable at junction points on the Delaware & Hudson Railroad Corporation named herein, will be absorbed to the extent specified (see paragraph following) upon carload freight (and upon less than carload freight as specified herein) when originating at or delivered on tracks or sidings of connecting railroad at such junction points, destined to or shipped from points located on or reached by the Delaware & Hudson Railroad Corporation.

"When switching charges at connecting railroads are in excess of the maximum absorption provided herein, such excess charges not absorbed will be in addition to the line haul rate."

The tariff then specifically provided that at Albany, N. Y.:

"The switching charge of the Albany Port District Railroad, will be absorbed upon carload freight (also upon less than carload freight in quantities as specified) received from or destined to points on or via the Delaware & Hudson Railroad Corporation, provided the freight charges for road haul of the carrier or carriers performing the service from point of shipment to destination are not less than the following minima;

| Switching Carrier. | Minimum Revenue for road haul of the carriers performing service from point of shipment to destination. | Maximum Switching charge to be absorbed. |
|---|---|---|
| Albany Port District Railroad. | $1.51 per ton, carloads $2.21 per ton (in quantities of 20,000 lbs or more) $4.41 per ton (In quantities as shown in Note A. | $5.00 per car (Note B). |

"Note B.—When the freight revenue of carrier or carriers absorbing the switching charge of the Albany Port District Railroad is less than the minimum revenue specified in this tariff to entitle shipment to switching absorption specified, and weight of the shipment equals or exceeds the weight shown in this tariff for switching absorption purpose, the amount of switching that will be absorbed will be the amount by which the freight revenue plus switching charges exceeds the minimum freight revenue shown herein."

Illustration.

Freight Revenue, (15 tons at $1.30 per ton) ..................... $19.50.

Switching Charge .............. 5.00.

$24.50.

Minimum freight revenue to absorb switching, (15 tons at $1.51 per ton) ..................... 22.65.

Amount to be Absorbed....... $ 1.85.

In this same tariff under "Rules Governing Tariffs" the minimum weight to constitute a carload was shown as 30,000 lbs. prior to October 1, 1933, and affecting classification, the minimum weight was increased to 36,000 thereafter.

The position of the parties in this controversy is well stated in the opinion of Division 3 of the Interstate Commerce Commission bearing date of January 9, 1936, (Plaintiff's Exhibit 1):

"It is the position of complainant that based upon the foregoing absorption provisions, the minimum revenue requisite for absorption for a shipment of any weight is $22.65, which is the product of 15 tons (minimum weight) multiplied by $1.51 per ton, and that this is made certain by the illustration given. The position of defendant, on the other hand, is that the minimum revenue stated in the tariff is not $22.65 but is simply $1.51 per ton, which must be applied to the actual weight of each shipment where more than the minimum and that the minimum weight of 15 tons prior to October 1, 1933, or 18 tons on and after that date, has no effect upon switching absorption, except to designate the lowest weight to which the switching absorption test may be applied. For a carload typical of those under consideration, 54,300 lbs or 27.15 tons, the charge for the line haul is $27.15 which, added to the switching charge, results in a total of $32.15. Under complainant's interpretation of the absorption provision this typical carload would be entitled to the maximum absorption of $5.00 because the total of $32.15 exceeds by $9.50 the minimum revenue of $22.65 necessary for absorption. Under defendant's interpretation, the minimum revenue requisite for absorption for a carload of 27.15 tons is $41.00, which is the number of tons multiplied by $1.51 per ton.

"Defendant's interpretation would in certain instances produce absurd results. For example, if the line-haul rate were $1.30, used in the illustration given in the tariff, and the loading were 30 tons, nothing would be absorbed since the resulting total, $39.00 plus $5.00 or $44.00, is less than 30 tons multiplied by $1.51 or $45.30.

"However, as indicated in the illustration, the amount to be absorbed is $1.85 for a carload of like traffic weighing half as much.

"Fairly construed by resolving reasonable doubts against the defendant, the absorption rules under consideration provided for absorption of part or all of the switching charge of $5.00 where the line-haul revenue plus the switching charge exceeded revenue of $22.65 prior to October 1, 1933 and $27.15 on and after that date."

Complainant's claim here is limited to shipments which were sufficiently heavy to meet tariff requirements as to minimum weight.

The defendant urges that the construction of the defendant's tariff relating to absorption of switching charges is purely a question of law like the construction of a statute and that the Court is in no wise bound by the construction of the commission but may and should make its independent construction thereon, a construction which, if properly made, would show no overcharge. The defendant asserts that the action might have been brought in this Court in the first instance without requiring any decision of the Commission.

It is quite true that when the words of the tariff are used in their usual and ordinary sense and not in any special sense understood only by shippers and carriers, the construction of the tariffs is one of law in which the Courts may make their own construction and decisions irrespective of the action of the Interstate Commerce Commission. Great Northern Railroad Co. v. Merchant's Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943.

But it is also true that when the words are not used in their ordinary sense but have their own peculiar meaning known in the trade and that meaning may best be determined by the evidence, then the construction of the tariff is not a pure question of law and the interpretation of the Commission as a body of experts is first required.

In the Great Northern Railway case the Court said, 259 U.S. at page 292, 42 S.Ct. at page 479:

"But where the document to be construed is a tariff of an interstate carrier, and before it can be construed it is necessary to determine upon evidence the peculiar meaning of words or the existence of incidents alleged to be attached by usage to the transaction, the preliminary determination must be made by the Commission; and not until this determination has been made, can the court take jurisdiction of the controversy."

So also it is said in Norge Corporation v. Long Island Railroad, 2 Cir., 77 F.2d 312, 314, certiorari denied, 296 U.S. 616, 56 S.Ct. 137, 80 L.Ed. 437:

"It is the rule that, in order to secure uniformity and avoid discrimination between shippers, resort must be first had to the Interstate Commerce Commission, and in the absence of a determination by that expert body, a Court is without jurisdiction to interpret the tariffs where there is a question of fact whether words in the tariff are used in their ordinary or in a peculiar, technical or trade sense, or where, because words are used in the latter sense, their interpretation requires a consideration of evidence establishing special facts. Director General [of Railroads] v. Viscose Co., 254 U.S. 498, 504, 41 S.Ct. 151, 65 L. Ed. 372."

In the case at bar both sides introduced evidence before the Commission bearing upon the construction of the tariffs in question. It may well be, however, that the introduction of such evidence is not conclusive upon either party upon the question of whether the tariff could be construed by the Court as a matter of law independent of the construction of the Commission.

It is not necessary, however, to decide the question whether this tariff may be construed as a matter of law, for this Court agrees with the construction placed on this tariff by the Commission. The construction was before Division 3 of the Commission, consisting of three members twice, and was later brought before the entire Commission. It is quite true that the vote in the Commission was 5 to 4 with two members not voting.

The essential words are these:—

"The amount of switching that will be absorbed, will be the amount by which the freight revenue plus switching charges exceeds the minimum freight revenue shown herein."

The defendant states the issue in this language:

"The question at issue is whether under the provisions of Rule 1 of Defendant's tariff, I. C. C. No. 13870, the 'minimum freight revenue' for switching absorption purposes of $1.51 per ton shown in said rule should be multiplied by the actual weight in tons of each of plaintiff's shipments, or by the minimum weight in tons as shown at Page 10 of the same tariff."

Under defendant's construction the greater the load in tons and the greater the revenue, the less absorption—in fact, none at all. Under the defendant's construction, the whole provision for switching charge absorption is almost meaningless.

The construction of the commission is the more reasonable.

The intent of the absorption provision is to protect the freight revenues and only allow the absorption when the freight rev-

enue is sufficiently above the minimum freight revenue to permit the absorption of the switching charges or some part thereof.

The conclusion is that the plaintiff is entitled to the return of the overcharge in the amount stipulated, namely $29,206.33.

■ In arriving at this conclusion the Court agrees with the defendant that the alleged change in this tariff, made December 30, 1933, bearing a symbol allowable only for increase of rates has no probative force whatever and is not considered in this Court in its decision.

This alleged change is not in the nature of an admission for an admission is something voluntarily said or perhaps done.

Where, as here, the person charged with the alleged admission is compelled to use the symbol in question by the requirements of public policy, whether he will or not, it loses its character as a voluntary act and therefore loses any force it might otherwise have as an admission.

The fact that the rate on pulpwood was reduced at plaintiff's request and that plaintiff for some time apparently made no claim for absorption of switching charges, makes allowance of overcharge seem inequitable. The plaintiff, however, is not the only person interested in or affected by tariff schedules. They must be approved by the I.C.C. and they affect all persons who ship under those rates.

Recovery by the plaintiff must be allowed.

There remains to be considered the question of the rate of interest. It is not disputed that the interest is a proper part of the damage which may be allowed for overcharge for the transportation of freight. The question is whether 6% is an excessive rate of interest to be allowed.

The Commission allowed 6% and that appears to have been the uniform rate of interest allowed by the Commission in like orders for payment by carrier of excessive freight charges ordered to be paid to the shipper. Many of these awards for damages including 6% interest have been approved by the Supreme Court. But in none of the cited cases has the Court passed upon the question of what rate of interest should be allowed.

So far as can be determined the rate of interest was never challenged in those cases and the question was whether interest at all should be allowed and not the rate of interest.

■ The fact that in the awards by the Commission which have reached the Supreme Court, interest was allowed at 6% has some persuasive force.

Upon the hearing before the Commission in this case the defendant offered much evidence upon the subject of the rates of interest. This evidence related to interest on various kinds of loans, such as U. S. Treasury notes and certificates, bankers acceptances (90 days), Commercial Paper (4 to 6 months) and call loans. The evidence covered a period of ten years from 1926 to 1936 or at least the first three months of 1936, except that the interest on U. S. Treasury Notes and certificates was not given after June 1934.

The defendant also offered evidence that prevailing rates of interest for bank loans have similarly declined and that the prevailing rates charged fell from nearly 6% in 1929 to only 2.70% in 1935. That in eight other northern and eastern cities where the rates were usually higher than New York, the statistics showed the prevailing rate of 3.37 for 1935 as compared with rates between 5% and 6% from 1919 to 1929. The rate varied between 1932 and 1934. Call loans ranged from 2.05 in 1932 to 1.00 in 1934. Commercial paper likewise declined from 2.84 in 1932 to 1.14 in 1934.

Other evidence is offered to show savings bank interest and the interest in capital markets on long and short term bonds, etc.

There is no doubt that interest rates have fallen materially in the past few years, dating from a time as far back at least as 1932.

Should the Court determine the rate of interest on the basis prevailing in these various kinds of loans above referred to.

It must not be overlooked that Government Bonds are about the best security in

the world and the faith and credit of the United States would obtain a lower rate of interest than in any other known securities.

So too, call loans are usually upon marketable securities whose value can be obtained in the open market at any time and the rate of interest is variable with varying economic conditions. Other features may also enter into these rates of interest.

What standards should the Commission or the Court apply and how should it apply these standards if the rate of interest in the classes of loans above referred to varies so frequently and so widely. One or more rates prevailed in 1932 and more than one in 1933 and others in each subsequent year. Moreover, many shippers are people of small resources and to say that the ordinary shipper could go to the bank and borrow money at any of the rates that prevail on Government bonds, call loans or bankers acceptances is not in accordance with facts. Most of these small shippers would have to pay 6% whatever the prevailing rate of interest in financial centers. If the rate is to be fixed in accordance with the circumstances of each particular shipper who has been overcharged, the amount of which overcharge has been directed by the Commission to be repaid to him, it will not only make discrimination between small and large shippers but it will impose a substantial burden both upon the Commission and the Courts to determine these variable rates of interest which prevail from time to time during the period covered by the overcharge, upon classes of loans of which the shipper perhaps has no opportunity to avail himself even if he has knowledge of them. Moreover, all these lower rates of interest are the subject of contract between the borrower and lender.

There is no rate of interest prescribed by Federal Statutes having any relation to transactions between carriers and shippers nor any general rate of interest relating to transactions between private citizens. State laws fix a maximum rate of interest chargeable.

■ This Court does not doubt that the plaintiff here may profit somewhat by fixing the rate of interest at 6% for it could probably borrow money during this time at less than 6%. But upon a consideration of all the factors entering into the lower rates, among others the fact that the prescribed rate of interest in the states has seldom or never been changed to conform to the lower rates of interest in financial districts except perhaps in the case of savings banks, it seems better to adhere to the prevailing rate of interest upon such overcharges, heretofore allowed and approved by the Courts to avoid discrimination and the other difficulties hereinbefore referred to, relating to rates that frequently change from time to time.

The fact that the Courts have held in negligence cases that the representative of the deceased employee is not entitled to a sum of money as damages made up by multiplying his annual wages by his expectancy of life, but that the same must be fixed upon the sum necessary to buy an annuity equal to the annual wages running for the period of the expectancy of life of the deceased employee, is not controlling. That takes the damages into a field of circumstances different from that in the case at bar.

The decision is that the award of 6% interest as part of the damages is proper and is allowed by this Court.

■ When the plaintiff recovers a judgment in such a case as this, the Court should fix an allowance of Attorney's costs for the plaintiff. 49 U.S.C.A. § 16(2). The costs are to be confined to Attorney's services in the Court action and are not to include services rendered by attorneys before the Interstate Commerce Commission. Meeker v. Lehigh Valley Railway Co., 236 U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644, Ann. Cas. 1916B, 691; Pennsylvania Railway Co. v. Minds, 250 U.S. 368, 39 S.Ct. 531, 63 L. Ed. 1039.

The other and greater services before the Commission must be otherwise provided for.

Counsel for plaintiff have asked the Court, if the decision is in favor of the plaintiff to withhold decision on the matter of an allowance to plaintiff's attorneys.

Counsel may submit affidavits or memorandum within six days after this date and

serve it on the attorneys for the defendant and send to the Court.

The attorneys for the defendant may have four days after receipt thereof, to file answering affidavits or objections and serve copy on attorneys for plaintiff.

If the latter desire to reply they may do so within two days.

The time and expense of an oral argument seems unnecessary but may be had if either party so desires and will so indicate.

Judgment may be entered for the plaintiff for the agreed amount of overcharge and interest at 6% plus the attorney's allowance to be made, besides taxable costs and disbursements to be taxed by the Clerk.