Nancy C. LINDSAY and Bruce H. Lindsay, Plaintiffs,

v.

ORTHO PHARMACEUTICAL CORP., Defendant.

No. 72 C 1283.

United States District Court, E. D. New York.

Sept. 10, 1979.

316

Barry McTiernan & Moore by Roger T. McTiernan, Bridget A. Lundy, New York City, for plaintiffs.

Patterson, Belknap, Webb & Tyler by David F. Dobbins, Karl E. Seib, Jr., Theodore B. Van Itallie, Jr., New York City, for defendant.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Plaintiff, Nancy C. Lindsay, brought this action against defendant, Ortho Pharma-

ceutical Corp. ("Ortho"),[1] manufacturer of the Ortho-Novum 2 mg. oral contraceptive, asserting that the defendant drug manufacturer was liable for injuries she suffered in January 1971 when she had a cerebrovascular accident ("CVA") or stroke allegedly as the result of her ingestion of defendant's oral contraceptive pills. Plaintiff, Bruce H. Lindsay, Nancy's now-estranged husband, also asserted liability against defendant Ortho for loss of his wife's support and services. After a trial, lasting over two weeks, a jury returned a verdict for both plaintiffs, in the amount of $750,000 for Nancy Lindsay and $75,000 for Bruce Lindsay. This court entered judgment reflecting the jury's verdict. Defendant now moves, pursuant to Fed.R.Civ.P. 50(b), for judgment notwithstanding the verdict, or in the alternative, pursuant to Fed.R.Civ.P. 59, for a new trial.

 On this motion defendant advances many of the same arguments which were advanced during the course of the trial, both to the court and to the jury. To the extent that the court has previously, during the course of the trial, addressed the legal arguments which defendant now asserts, this memorandum will not repeat at length the explanations for rulings already part of the record. To the extent defendant on this motion makes arguments based on the evidence introduced at trial, which either were or could have been made to the jury, the court is guided by the well-established principles that, on a motion for judgment notwithstanding the verdict, the court must view the evidence, including any inferences which may be drawn therefrom, in the light most favorable to the party who secured the jury verdict, *see, e. g., Pritchett v. Rosoff*, 546 F.2d 463, 466 (2d Cir. 1976); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970); *Oresman v. G. D. Searle & Co.*, 388

F.Supp. 1175 (D.R.I.1975), and that a motion for judgment notwithstanding the verdict may be granted only when, without weighing credibility, there can be but one reasonable conclusion as to the proper judgment. *See, e. g., Simblest v. Maynard, supra; Zavala v. Citicorp Services, Inc.*, 426 F.Supp. 241 (S.D.N.Y.1976); *Oresman v. G. D. Searle & Co., supra*. Further, the court does not propose to set forth in detail the underlying law or the facts developed at trial, except as they pertain directly to defendant's motion.

The arguments advanced by defendant will be considered in the order in which they appear in defendant's Memorandum in support of its motion.

I

Defendant's first point is that it is entitled to judgment in its favor because the evidence at trial established that, in defendant's words, "the prescribing physicians, Harris and Van Son, were fully apprised of the dangers reported to be associated with the use of the drug." Implicitly or explicitly suggested during the course of this first point (and others) is a variety of additional propositions which deserve explicit examination, such as that plaintiff[2] rather than defendant bears the burden of establishing that the doctors she came in contact with were ignorant of the matters not disclosed in the defendant's warnings and, thus, "relied" on the inadequate warnings; that only the state of knowledge of the prescribing physicians, Harris and Van Son, need be examined and not the state of knowledge of the other doctors plaintiff came in contact with, in particular, the doctors to whom she was referred for numbness and tingling sensations which developed after she commenced taking the pill; and that Doctor Van Son was the doctor at the office of

---

1. Plaintiff originally also named the first prescribing physician, Dr. Bruce A. Harris, as a defendant in this suit. The action as against Doctor Harris was subsequently discontinued.

2. Because defendant has not made any application for relief with regard to the claim of Bruce Lindsay separate from its application with regard to the claim of Nancy C. Lindsay and

because the claim of Bruce Lindsay was dependent in the first instance on a favorable resolution of Nancy Lindsay's claim, this opinion does not deal separately with Bruce Lindsay's claim and uses the word, "plaintiff" in the singular to refer to plaintiff Nancy Lindsay's claim.

Planned Parenthood, to which plaintiff resorted to obtain a renewal of her prescription, whose state of knowledge or ignorance of the dangers associated with use of the drug was relevant to the issues on trial.

Initially, it bears noting that, as defendant accurately states at one point, the question of the physician's knowledge of the dangers associated with the drug is relevant to the issue of proximate causation, an issue on which plaintiff bore the burden of proof as the jury was advised. The jury was not instructed, and the court was not asked to instruct the jury, that there was an element of reliance separate and apart from causation on which plaintiff also bore the burden of proof. It is further clear from the case law and it is reasonable, given the nature of this type of action, that the element of causation may be established prima facie by proof that in the light of what a licensed physician could reasonably be expected to know given his education and training, the relevant warnings were inadequate to apprise the medical profession in general of the dangers associated with use of the drug. *See Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1281 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522, 538–39 (1974). In other words, where there is evidence that the physicians who, it reasonably can be forseen, may have occasion either to prescribe or otherwise to come in contact with use of the drug have not been adequately warned, the courts have understandably shifted to the defendant the burden of coming forward with some evidence that despite the inadequacy of the warnings, the particular physicians involved had information from sources other than the drug company of the undisclosed risks involved in use of the drug. Once the defendant comes forward with such evidence, then the burden of persuasion is again on the plaintiff to establish that the doctors claiming full knowledge did not, in fact, possess it or did not bring it to bear or were nevertheless led by the inadequate warnings to take steps which caused injury to the plaintiff.[3]

Viewed in the light of these general principles, it is clear that the jury in this case had before it sufficient evidence from which to conclude that plaintiff had sustained her burden of proving that the inadequate warnings accompanying the pill proximately caused plaintiff's CVA, despite evidence from two of her doctors, Doctors Harris and Van Son, concerning what they knew about the risks of oral contraceptives. With respect to Doctor Harris, the doctor who initially prescribed the pill for plaintiff and thereafter permitted her to resume taking the pill after she had displayed what other witnesses identified were the signs of susceptibility to the kind of injury by the drug which led to her stroke, perhaps the first thing which needs be said is that his testimony presented issues of credibility for the jury to resolve. At the time Doctor Harris testified in his deposition, which was read into evidence, he was a defendant in the suit and had some interest in establishing that he was not ignorant of information available to him concerning the risks associated with oral contraceptives.[4] Moreover,

**3.** Nothing in the cases cited by defendant in this connection is contrary to the rules of law stated in the text. Each deals with the situation in which, unlike this case, only a single doctor is involved and he testifies without contradiction and in detail to the adequacy of his information from other sources. *Chambers v. G. D. Searle & Co.*, 441 F.Supp. 377 (D.Md. 1975), *aff'd*, 567 F.2d 269 (4th Cir. 1977); *Goodson v. Searle Laboratories*, 471 F.Supp. 546 (D.Conn.1978); *Magill v. G. D. Searle & Co.*, No. 72–1118 (E.D.Pa. May 15, 1975), *aff'd*, 535 F.2d 1247 (3d Cir. 1976). Here, several doctors were involved not only in prescribing the contraceptive, but also in treating Mrs.

Lindsay after her prescription and not all of the relevant prescribing physicians nor all of the treating physicians testified.

**4.** Defendant suggests that Doctor Harris' testimony was contrary to his interest presumably because he could have professed complete ignorance and placed the entire blame for Mrs. Lindsay's stroke on the drug company. This argument could have been (and perhaps was) presented to the jury. However, whichever way the doctor testified his testimony would have had an effect on the lawsuit against him and the jury was entitled to evaluate his testimony in the light of this patent interest. More-

enough of Doctor Harris' deposition was read into evidence to permit the jury to apply in a meaningful way to Doctor Harris' fencing with plaintiff's attorney the court's instructions—not objected to—concerning the manner of evaluating the credibility of witnesses whose testimony is presented by deposition. Most prominently before the jury as a question of credibility was why, if the doctor in fact knew, as the defendant now argues he did, of the association between oral contraceptives and thromboembolic disorders caused by an increased tendency towards blood clotting, he persisted in prescribing the pill for Mrs. Lindsay after she displayed signs of thromboembolic disorder while under his care.

However, of equal importance in assessing Doctor Harris' testimony is the recognition that the doctor did not testify that he had "full information" concerning the risks associated with the pill. Instead, he testified rather cryptically (1) that he was aware (as he believed the package inserts said) that "thromboembolic disorders were under investigation but . . . there was no evidence to support this at the time", and (2) that he had advised Mrs. Lindsay (and therefore presumably himself believed) that "they [the pills] have been said to cause blood clotting . . . [but] that the evidence for this is extremely debatable."

With respect to this testimony, there was ample basis for the jury to infer, first, that the "thromboembolic disorders" concerning which Doctor Harris testified were no more than the reported instances. of the more common and less serious thrombophlebitis, the existence of which was acknowledged by the drug company in its package inserts, even if in what may be characterized as an understated and even misleading manner in view of the broader implications of those reports, *see, infra,* and second, that Doctor Harris was not aware of the number of more serious CVA's of the type suffered by plaintiff which had been reported to the drug company prior to the doctor's prescription of the drug for Mrs. Lindsay. With regard to the second aspect of Doctor Harris' state of knowledge, as indicated by the above-quoted testimony, the jury could easily have decided on the evidence before it that Doctor Harris' conclusion that the causal relation between the pill and blood clotting was "extremely debatable" itself evidenced the effectiveness of the drug company's literature in watering down and downplaying the effect of reported studies concerning thrombophlebitis and the implications of those studies, as well as other information in the drug company's possession, with regard to the relationship of the pill to thromboembolic phenomena in general.[5] In other words, the jury could reasonably have concluded that, even if Doctor Harris did have some independent knowledge concerning the risks associated with the pill, the effect of that independent

over, it is not implausible to conclude that the doctor's *best* interest lay in mounting either (1) a common defense with the drug company, i. e., a defense along the lines of that actually presented in this case which would suggest that the doctor was more or less aware of all the matters which the drug company was accused of leaving out of the label either from independent sources or because it was all more or less implicit in the label used by the drug company if one read between the lines, but that Mrs. Lindsay's CVA did not result from her use of the pill or that the symptoms which she displayed did not call for any action other than that which the doctor took, or (2) a defense that he was more or less aware of the information then generally available to the medical profession concerning the dangers associated with the drug, indicating his diligence in keeping up with the generally available medical

literature, but leaving it open to the jury to find that the drug company had available to it, but did not fully disclose, information not generally known to the medical profession.

**5.** No evidence was presented during the trial to rebut the evidence introduced by plaintiff that the estrogen component of oral contraceptive pills was recognized as increasing the tendency of blood to clot by increasing "platelet stickiness" as one witness testified. Hence, Doctor Harris' statement that the evidence that the pills caused blood clotting was "extremely debatable" could well have been taken by the jury to evidence considerable ignorance concerning the only mechanism by which an association could be explained between the disclosed instances of thrombophlebitis and the undisclosed reports of CVA's.

knowledge had been negated by defendant's warnings themselves, specifically by the manner in which those warnings "watered down" or unduly minimized the significance of the information of which the doctor had independent knowledge. In that connection it should be noted that the assertion that defendant had "watered down" or unduly minimized what was known about the risks associated with the pill was one, if not the primary theory presented by plaintiff at trial in support of her claim of inadequate warnings.

As previously indicated, it is also of significance in assessing the question whether plaintiff sustained her burden of proving causation with respect to Doctor Harris to note that, while Doctor Harris did refer plaintiff to another physician, Doctor Vastola, at the time in February 1966 when she reported the symptoms of a thromboembolic phenomenon having the same underlying mechanism, although evidenced to a much lesser degree as that which resulted in her CVA, Doctor Harris did not discontinue Mrs. Lindsay's use of the pill as a result of her report of tingling and numbness sensations. Indeed, Doctor Harris did not discontinue Mrs. Lindsay's use of the pill until March 1967, when he did so for what proved to be only a short period of time, and not because of the tingling and numbness sensations which she had experienced, but because of the fact that she was exhibiting brown facial blotches, a side effect identified in the package insert as associated with the use of the pill.

█ A defendant drug manufacturer should not, of course, be held responsible for what simply may have been negligent conduct on the part of the prescribing physician. However, the evidence in this case, particularly the evidence indicating that Doctor Harris did go so far as to send Mrs. Lindsay to another doctor for consultation as to the origins of her tingling and numbness sensations and the evidence indicating that Doctor Harris did advise Mrs. Lindsay to discontinue her use of the pill after he had identified her complaint of brown facial blotches as a side effect of the pill, would

reasonably support a finding that Doctor Harris' failure to take Mrs. Lindsay off the pill as a result of her experiences of tingling and numbness sensations, and his allowing Mrs. Lindsay to resume use of the pill in September 1967 was not due to any negligence on the doctor's part but rather was due to a lack of full and important information as to the possible side effects of oral contraceptives.

█ In addition to and independently of the question of Doctor Harris' knowledge of the risks associated with the pill, the jury might reasonably have found that evidence of a causal relationship between the inadequate warnings and plaintiff's eventual stroke existed because of her efforts to obtain medical advice from Doctor Vastola (a neurologist to whom she was sent by Doctor Harris on account of her reported tingling and numbness sensations, Doctor Weingarten (her general physician whom she also consulted about her symptoms) and Doctor Ryan (a neurologist called in by Doctor Weingarten). Prima facie the jury could have found (and did according to a special interrogatory submitted to them on this issue) that evidence of the inadequacy of the warnings established causation in the absence of rebuttal testimony concerning what these doctors knew about the connection between the pill plaintiff had been taking and the symptoms of thromboembolic disorder concerning which she consulted them. No rebuttal testimony with regard to the level of information of these doctors was offered and defendant's claim that it was plaintiff's obligation to call those doctors on her case is contrary to sound reason and the case law cited above, with which defendant was familiar through its own involvement in the litigation which gave rise to it. See McEwen v. Ortho Pharmaceutical Corp., supra, 528 P.2d at 538; Reyes v. Wyeth Laboratories, supra at 1281. Clearly, the jury was entitled to find on the evidence that, had these doctors been advised through the Physicians Desk Reference ("PDR") volumes or other source of information emanating from the drug company of, inter alia, the reports which the

drug company had received of CVA's suffered by users of the pill, the "treating" doctors would have recognized the significance of plaintiff's past use of the pill and the dangers of her continued use in time to prevent the CVA which gave rise to this lawsuit. See the discussion in Section II, *infra.*

Finally, the court rejects defendant's argument that the evidence establishes that Doctor Van Son, the doctor at Planned Parenthood who actually saw Mrs. Lindsay and gave her a new prescription for Ortho Novum 2 mg., had full knowledge of the risks associated with oral contraceptives and that, accordingly, the jury could not properly have based a finding of liability on any inadequacy in defendant's warnings at the time Mrs. Lindsay went to Planned Parenthood. To the contrary, the court finds that there was sufficient evidence before the jury to support a determination that had the appropriate physicians at Planned Parenthood been given adequate warnings about the pill, they would have established procedures and a routine line of inquiry which would have elicited from Mrs. Lindsay her pertinent prior medical history, would have flagged her earlier symptoms, and would have resulted in action which would have avoided Mrs. Lindsay's continued use of the pill after her initial visit to the Planned Parenthood clinic.

Although defendant in its argument on this phase of the causation issue focuses solely on Doctor Van Son and what he knew about those risks associated with oral contraceptives which might not have been adequately reflected in the package inserts at the time Mrs. Lindsay went to Planned Parenthood, the testimony both of Mrs. Lindsay and of Doctor Van Son himself indicated that the Planned Parenthood clinic operated under a bifurcated system in which clerical personnel who were not physicians took the patient's medical and social history and the physician, such as Doctor Van Son, simply conducted a physical examination of the patient. Mrs. Lindsay testified that to the best of her recollection Doctor Van Son did not ask her any ques-

tions about her past medical history, testimony which was not contradicted by Doctor Van Son. But it was precisely in that part of Mrs. Lindsay's visit to Planned Parenthood in which she was asked questions about her past medical history and experiences, and not in the course of the actual physical examination that important information such as her past episodes of tingling and numbness might have been elicited. Further, the evidence does not indicate that Doctor Van Son ever discussed the possible dangers of the pill with Mrs. Lindsay. Again, the evidence suggests that such a discussion may not have been part of the physician's responsibility under the bifurcated system in existence at Planned Parenthood. Thus, it is not the knowledge of Doctor Van Son which is most relevant to the instant case, but rather the knowledge of those physicians in charge of the Planned Parenthood operation, particularly those who devised the operating procedures pursuant to which plaintiff was interviewed, and there is nothing in the record regarding those physicians' knowledge of the dangers of the pill.

However, even apart from the above consideration, based on the organization of the Planned Parenthood office, it is not accurate to state that the jury could have reached no reasonable conclusion on the basis of the evidence introduced at trial other than that Doctor Van Son had full and complete independent knowledge of the dangers associated with the pill and that that independent knowledge negated the element of causation with regard to any inadequacy in defendant's warnings as of the time Mrs. Lindsay went to Planned Parenthood. Doctor Van Son's testimony, just as the deposition testimony of Doctor Harris, presented a genuine issue of credibility for the jury to consider. Again, as it had to do in evaluating the evidence of Doctor Harris' independent knowledge, the jury might reasonably have considered the extent to which the inadequacy of defendant's warnings may have counteracted whatever independent knowledge concerning the risks associated with oral contraceptives Doctor Van Son might have had. In

that connection, the jury might reasonably have concluded, based on the evidence introduced and in the absence of any evidence to the contrary, that Doctor Van Son had affirmatively discounted and disregarded defendant's warnings, that the relevant warnings "watered down" and unduly minimized the pill-associated risks suggested by precisely that information of which defendant asserts that Doctor Van Son had independent knowledge in such a fashion as to have negated the effect as a separate factor in this case of any independent knowledge on the part of Doctor Van Son.

Thus, this court finds no merit to the arguments made in defendant's first point as a basis for granting defendant's post-trial motion.

## II

Defendant's second argument is that the court improperly "injected into the case the issue of the adequacy of defendant's warnings to Mrs. Lindsay's 'treating physicians'" and that for that reason the jury's verdict must be set aside.

■ However, as the court noted when defendant's counsel raised this objection following the court's instructions to the jury on the subject, the disputed issue was not of the court's making. To the contrary, evidence with regard to the so-called "treating physicians'" examination and care of Mrs. Lindsay following her display of the symptoms of thromboembolic disorder emerged during the course of the trial was already before the jury, and as a matter of common sense, presented an issue as to whether plaintiff's injury might not have been avoided had those physicians been more fully advised concerning the side effects of and contraindications for the pill.

Specifically, the evidence before the jury, as already briefly highlighted in Section I, supra, was that Mrs. Lindsay consulted three physicians in addition to those who prescribed Ortho-Novum 2 mg. for her use. Two of those other physicians, Doctors Vastola and Ryan, specialized in neurology; the third, Doctor Weingarten, was Mrs. Lindsay's family physician whom she consulted

periodically from sometime in 1966 throughout the period she remained on the pill and thereafter until she suffered her stroke.

According to Doctor Harris' testimony, he referred Mrs. Lindsay to Doctor Vastola for examination because of the tingling and numbness sensations she reported to him at her February 15, 1966 checkup. Doctor Harris further testified that he received a written report from Doctor Vastola concerning the latter's examination of Mrs. Lindsay. Doctor Vastola's report, which was received in evidence, indicates that at the time he wrote the report and presumably at the time he examined Mrs. Lindsay, Doctor Vastola was aware that Mrs. Lindsay was taking birth control pills. The evidence further indicates that Doctor Vastola made no connection between Mrs. Lindsay's tingling and numbness sensations and her use of the pill, and that he did not himself advise or suggest to Doctor Harris that the latter consider advising Mrs. Lindsay to discontinue her use of the pill.

Mrs. Lindsay testified that Doctor Weingarten sent her to see Doctor Ryan because she had been upset by the report which Doctor Vastola had sent to Doctor Harris. Defendant asserts that the evidence indicates that when Mrs. Lindsay went to see Doctor Ryan in June 1967 she was not taking the pill, having temporarily discontinued its use several months earlier because of brown facial blotches. Mrs. Lindsay, however, testified that throughout the approximately five-year period she was taking oral contraceptives she never stopped taking them for longer than one month at most. But regardless of how the jury chose to resolve this disputed factual issue, the evidence, by indicating a direct relationship between Doctor Vastola's earlier report and Mrs. Lindsay's examination by Doctor Ryan, also indicates that the reason for Mrs. Lindsay's examination by Doctor Ryan was causally related to the tingling and numbness sensations which she had previously experienced while on the pill and which, Doctor Ryan's written report to Doctor Weingarten indicates, were the subject of inquiry in the course of his examination

of Mrs. Lindsay. Again, the evidence indicates that Doctor Ryan made no connection between the tingling and numbness sensations which Mrs. Lindsay had experienced and her use of the pill.

The foregoing evidence indicates that each of the three treating physicians was in a position to have taken some action to cause Mrs. Lindsay to discontinue her use of the pill well in advance of the date in October 1970 when she actually stopped using the pill, but that none of the three doctors took any such action because none connected Mrs. Lindsay's tingling and numbness sensations with her oral contraceptive use. As discussed below in connection with the statute of limitations defense raised by the defendant, it is a permissible inference from the evidence that had Mrs. Lindsay discontinued her use of the pill at such an earlier point in time, she never would have sustained the injury which gave rise to this action. Further, it was a permissible inference based on the foregoing that had the defendant given adequate warnings to the treating physicians of the risks associated with the pill, one of them would have made a connection between the pill and the tingling and numbness sensations which Mrs. Lindsay experienced. Thus, the evidence presented at trial placed squarely in issue the role of the treating physicians and the adequacy of the warnings to those physicians concerning the risk of CVA's associated with the pill.

Under these circumstances, if defendant wished to have the jury directed not to consider the treating physicians' role and not to consider the adequacy of the warnings to those physicians, it was its obligation to seek such a limiting instruction. However, the requested instructions defendant now points to as designed to restrict the jury's deliberations to the role of the prescribing physicians Harris and Van Son were hardly adequate to advise the court much less the jury that the jury was not to consider the causal role of the treating physicians. The ostensible subject of the requested instructions now referred to by defendant was "proximate cause." Moreover, the factual portion of the requested charge mentioned only Doctor Van Son ostensibly because of defendant's oft-expressed theory, explicitly rejected by the court before the charge, that only the actions of Doctor Van Son could be reviewed by the jury under the applicable statute of limitations. For defendant now to say that those instructions were sought in order to convey to the jury that it should not consider in its deliberations whether the treating physicians were adequately warned or, further, that defendant itself was somehow misled by the court's ruling on that requested charge because it deemed that ruling to have limited the case to the warnings given to the prescribing physicians is disingenuous. The record, moreover, indicates that, following this court's ruling that it would give the requested "proximate cause" charge "in substance," and despite the fact that the requested charge referred solely to Doctor Van Son, defendant was under no misapprehension as to the fact that the issue of the adequacy of defendant's warnings to Doctor Harris was still very much in the case. Thus, defendant must have understood that the court's ruling, that it would charge "in substance" as requested by defendant on the issue of proximate causation, was a ruling that the legal principles stated in the requested charge were accurately presented and would be so charged, not that the court agreed with and would limit itself in its instructions to the particular factual circumstances and premises of the application of those legal principles as expressed in defendant's request.

■ Defendant also asserts that it was improper to submit the issue of the adequacy of warnings to the treating physicians to the jury because none of the three treating physicians took the stand and testified that he actually had read any of the defendant's labelling concerning Ortho-Novum 2 mg. However, as indicated by the discussion of the issue of proximate causation in Section I, *supra*, of this opinion, the case law does not support defendant's argument that a prima facie case of inadequacy of warnings with respect to a particular physician cannot be established unless plaintiff calls the

physician to the stand to testify that he read warnings provided by the defendant drug manufacturer. Indeed, the cases indicate that in many, if not most, actions of this nature the plaintiff does not call the physician as a witness on her behalf. *See Chambers v. G. D. Searle & Co., supra*, 441 F.Supp. at 382, 385.

The evidence in the present case supports an inference that the treating physician must have seen and read defendant's warnings regarding the pill. First, the evidence at trial showed that the drug companies did not, in fact, limit their communications with the medical profession to obstetricians and gynecologists who might be expected to prescribe the pill by strict use of the "package insert" to reach only that segment of the medical community. Rather, the evidence showed that whether through the PDR, which contained the language of the package insert verbatim, advertisements in medical journals of general circulation, which were required by law, *see* 21 U.S.C. § 352 (1970), to contain the pertinent labelling, or "Dear Doctor" letters, the defendant drug company during the period relevant to this action undertook to speak to the medical profession at large and not simply to the prescribing physician about oral contraceptives and their use. Indeed, as discussed below, the jury could reasonably have found that it was part of the drug company's duty, given the risks presented by the pill, to communicate not only with those physicians who might be expected to prescribe the pill, but also with that portion of the medical profession which might be called upon to treat the patient for pill-associated side effects. Further, the evidence reasonably permits the inference that the particular treating physicians here involved, confronted as they were with a medical history involving the use of defendant's pill, would have consulted the generally available warnings concerning that drug. That inference, as well as an inference of reliance on those warnings, is particularly strong with respect to the two specialists because the specific symptoms for which they were consulted, as well as the symptoms indicated in defendant's listings of side effects and contraindications, involved matters within their particular field of expertise and thus matters to which they would be expected to be attuned and whose significance and implications they might be expected to seek to track down.

In the face of this evidence, no rebuttal testimony was introduced to establish that the treating physicians had not read or relied upon defendant's warnings. Moreover, if defendant believed that in the circumstances of this case the customary rule with respect to proximate causation, see discussion in Section I, *supra*, did not apply and prima facie proof of inadequacy of the relevant warnings should not have been taken as prima facie proof of causation, it should have presented the issue at trial by a motion to strike the evidence regarding the treating physicians' involvement as not "connected up" or by a request for a limiting instruction. Neither course was followed.

 Even if the evidence did not permit an inference, as it does, that the treating physicians read and relied upon defendant's actual warnings, that would not preclude a finding of the inadequacy of defendant's warnings with respect to the treating physicians. A finding of inadequate warnings may be based not only on the contents of the warnings and other materials which the defendant did provide to the medical community, but also on the failure of the defendant to take reasonable measures to provide the medical community through vehicles other than the standard labelling with information about risks which it was reasonably foreseeable the medical community would need to know to enable it to properly treat patients using the defendant's drug. The evidence in this case supports a finding that it was reasonably foreseeable that physicians other than those actually prescribing the pill would need information about the risks associated with defendant's drug because patients exhibiting symptoms the origins of which they themselves did not know would typically consult a treating, and not the prescribing physician. The jury might reasonably have

found based on the evidence in this case that the defendant failed to take reasonable measures to alert treating physicians of risks associated with the pill in such a manner that symptoms possibly associated with use of the pill could be recognized as such and so that treating physicians might ask appropriate questions of their patients concerning their medical history and current health-related practices.

In all events and even assuming that the issue of the adequacy of defendant's warnings to the treating physicians should not have been submitted to the jury, in the face of the jury's response to Special Interrogatory IV accompanying the general verdict, which was drafted with the assistance of defendant's counsel, it borders on the frivolous to now seek a new trial on the basis of the court's alleged "injection" of the "treating physicians" issue into the case. The jury's answer to Special Interrogatory IV clearly indicated that there was a separate and independent basis for the jury's finding that defendant's warnings were inadequate and for the jury's verdict—namely, the finding that the defendant gave inadequate warnings to the prescribing physicians.

Special Interrogatory IV was drafted specifically in response to defendant's objection to the court's submission to the jury of the issue of the adequacy of defendant's warnings to the treating physicians and with the specific purpose, made known to counsel for both sides, of avoiding just the type of argument defendant now advances and of preventing the need for a retrial by eliciting a clear statement from the jury as to the bases of their finding of inadequate warnings. Further, it was the intention of this court, and the record reflects, the understanding at that time of counsel for both sides as well that in submitting Special Interrogatory IV to the jury, the court was presenting the jury with two alternative bases for liability either one or both of which considered independently the jury might find had been established by the evidence. Defendant did not object to the submission of Special Interrogatory IV to the jury nor did it object to the language of that Special Interrogatory in its final form.[6] Indeed, as noted above, the final language of Special Interrogatory IV reflected suggestions from and was altered specifically to accommodate the views of the respective counsel and particularly counsel for the defendant.

Now, however, defendant appears to have decided that the language of Special Interrogatory IV leaves open the argument that the jury might have found the defendant liable for inadequate warnings only because of the combination of its separate findings that inadequate warnings were given to the prescribing and treating physicians respectively. Assuming that the language of Special Interrogatory IV does, without a tortured construction, lend itself to the interpretation suggested by the defendant, an assumption which this court by no means accepts, the possibility of a combined, interrelated basis for the jury's finding of inadequate warnings and consequent liability such as defendant now suggests was never contemplated by this court at the time of the drafting of Special Interrogatory IV and was never noted by counsel for either party contemporaneously with the drafting and submission to the jury of that special interrogatory. Even more to the point, that possibility finds no support in the evidence, in any theory presented to the jury during trial or in the court's instructions to the jury which, as the excerpts quoted by defendant in its moving Memorandum on this motion clearly show, presented the theories of inadequate warnings to the prescribing and treating physicians respectively as two alternative, independent bases for finding liability against the defendant. Indeed, it is difficult, if not impossible to imagine under what rationale the jury might have concluded that a combination of inadequate warnings to both prescribing and treating physicians was necessary to establish the defendant's liability once the

6. For the discussions in court surrounding the submission to the jury of Special Interrogatory IV, *see* Tr. Dec. 21, 1978, pp. 90–97.

jury identified the inadequacy of each group of warnings as being causally related to plaintiff's injury inasmuch as, accepting all additional findings implicit in the jury's verdict, Mrs. Lindsay's injuries could have been avoided had *either* the prescribing physicians not prescribed or taken Mrs. Lindsay off the pill, *or* had the treating physicians advised Mrs. Lindsay to discontinue her use of the pill.

Defendant in this connection relies on *Morrissey v. National Maritime Union of America*, 544 F.2d 19 (2d Cir. 1976). *Morrissey* was an action by a union member against the union and union officials in which the union member asserted two claims under the Landrum-Griffin Act. The Second Circuit found that one of the Landrum-Griffin Act claims, that under 29 U.S.C. § 411(a)(2) involving the right to meet and assemble freely and to freedom of speech, had been properly submitted to the jury, but that the trial court had committed error in submitting to the jury the other Landrum-Griffin Act claims, that under 29 U.S.C. § 411(a)(5) involving improper disciplinary action. The Court of Appeals further found that, under the circumstances presented, the improper submission to the jury of the one Landrum-Griffin Act claim under 29 U.S.C. § 411(a)(5) required that the general verdict in plaintiff's favor be set aside.

The Court cited the general rule that "when one of the two claims that have been submitted to the jury should not have been submitted, a general verdict . . . cannot stand." 544 F.2d at 26. With specific regard to the case before it, the Court stated that it could

> "find no sufficient basis for confidence that the verdict on the [Landrum-Griffin Act] count would have been rendered, and particularly that the same verdict would have been rendered, if the com-

plaint under [29 U.S.C. § 411(a)(5)] had not been submitted."
544 F.2d at 27.

The instant case involves, however, more than a simple general verdict. Here, the general verdict was accompanied by answers to special interrogatories indicating the bases for the jury's finding of liability on plaintiff's products liability claim. That was not the case in *Morrissey, supra*.[7] Further, in keeping with the analysis indicated in *Morrissey, supra*, this court finds every basis for confidence that the verdict in this case on plaintiff's products liability claim would have been rendered, and particularly that the same verdict would have been rendered if the issue of the adequacy of the warnings to the treating physicians had not been submitted to the jury.

██ As this court understands defendant's argument, defendant reads *Morrissey* as standing for the principle that whenever two theories of liability, one proper and the other improper, are submitted to the jury, if it appears that the jury sustained both theories of liability, the resultant general verdict in plaintiff's favor must be set aside. As articulated by the defendant, that principle leaves no room for a contrary result even if it further appears that the proper theory standing alone would have resulted in the same verdict. In support of that principle, defendant cites the statement in the *Morrissey* opinion that because the court would guess that the jury had sustained both the proper and improper theories of recovery, the error in submitting the improper theory to the jury was not harmless, see 544 F.2d at 27. However, a fair reading of the *Morrissey* court's statement, taking into account the fact that the statement is accompanied by a reference to the large amount of punitive damages awarded by the jury, makes clear that it was not simply because the Second Circuit guessed that the jury had probably sustained both theories of recovery that the court held the

---

7. The trial court in *Morrissey, supra*, did give the jury a special verdict form, the apparent purpose of which was to separate out the various elements of damages and to identify the amount of damages found against each of the various defendants. However, the special verdict form contained no indication of the basis or bases on which the jury had found liability against any of the defendants on the Landrum-Griffin Act claim.

error not harmless, but because the court further believed that the combination of the jury's findings sustaining both theories of recovery may have had an effect on the jury's verdict, specifically on the amount of punitive damages awarded by the jury. Thus, the *Morrissey* opinion suggests that a general verdict must be set aside where the jury probably or definitely sustained two theories of liability on a particular claim, one of which theories was improper, *only* if the court determines that the jury's finding sustaining the improper theory may have affected the general verdict in some manner.[8]

In this case, as previously stated, the court has no doubt that the jury's finding of liability would have been the same had only the issue of the adequacy of the warnings to the prescribing physicians been submitted to the jury. Further, this court can also state with confidence that the submission to the jury of the issue of the adequacy of the warnings to the treating physicians had no effect on the amount of damages awarded to plaintiffs—those damages being strictly compensatory in nature and, therefore, not dependent in any way on an evaluation of the nature of defendant's actions.

■■■ To summarize this court's determination with regard to defendant's second argument in support of its present motion, this court finds that there was evidence presented at trial which warranted the submission to the jury of the issue of the adequacy of defendant's warnings to the treating physicians, but that even if the issue regarding the treating physicians was improperly submitted to the jury, the separate and independent alternative finding by the jury as established by the answers to Special Interrogatory IV that inadequate warnings had been given to the prescribing physicians supports the general verdict in plaintiff's favor and permits the general verdict to stand.

### III

Defendant's third argument in support of its present motion is that the evidence establishes as a matter of law that Mrs. Lindsay was contributorily negligent and that she misused the drug. Accordingly, defendant maintains it was entitled to a directed verdict at the conclusion of the trial and is now entitled to judgment notwithstanding the verdict. Alternatively, defendant asserts that the court's instructions to the jury on the issues of contributory negligence and product misuse were erroneous and require a new trial.

After reviewing the post-trial memoranda, the court finds no basis for altering its view expressed at the conclusion of trial that the evidence presented at trial warranted a submission of the issues of contributory negligence and product misuse to the jury.[9] Although defendant characterizes Mrs. Lindsay's use of Ortho-Novum 2 mg. between March 1968 and February 1970 as "unauthorized" and repeatedly refers to Mrs. Lindsay as one who "self-prescribed" or "self-administered" defendant's drug, these characterizations were not undisputed

---

8. Accordingly, this court rejects defendant's assertion that "[i]t is the holding of *Morrissey* that where there are two *separate* proximate causes and it is not convincingly shown that the jury has not relied upon both the proper and improper claims in reaching the general verdict, the verdict cannot stand." (Emphasis added.) If a proper theory of recovery can stand separately and independently in support of a general verdict and if, as in this case, it is apparent that the jury sustained that proper theory of recovery, neither logic nor the *Morrissey* opinion would countenance a result by which a court would ignore as though it didn't exist the jury's finding sustaining the proper theory of recovery simply because the jury also sustained another, separate and independent

theory of recovery attacked as improperly presented to it.

9. Although defendant in its moving Memorandum advanced some separate arguments with respect to the questions of contributory negligence and product misuse, this court was and is of the view that on the facts here presented the issues raised by the two questions are identical. Accordingly, this court charged the jury on the relevant issues under the single rubric of contributory negligence, a course to which defendant raised no objection. In the same vein, this court in this opinion addresses the relevant issues in terms of the single question of plaintiff's contributory negligence.

factual propositions, but rather were matters of argument to the jury based on all of the relevant evidence.[10] Indeed, acceptance of these characterizations would not lead inexorably to the legal conclusions advanced by defendant in this part of its motion; rather, they tend to obscure rather than to advance the required analysis— namely, whether under all of the circumstances and viewing the evidence, as one must on a motion of this nature, most favorably to plaintiff, the evidence permits a finding that Mrs. Lindsay exercised reasonable care for her own safety.

The evidence on which defendant bases its assertion of contributory negligence and product misuse was essentially as follows. In September 1967 after agreeing to Mrs. Lindsay's resumption of use of the pill, Doctor Harris sent plaintiff Lindsay a written prescription for Ortho-Novum 2 mg. That prescription was good for six months, or until March 1968. Doctor Harris never provided Mrs. Lindsay with another written prescription for Ortho-Novum 2 mg. after September 1967, nor did any other physician until February 1970 when Mrs. Lindsay went to the Planned Parenthood clinic and got a new written prescription from Doctor Van Son. Mrs. Lindsay testified that she was taking Ortho-Novum 2 mg. throughout this period, and specifically from March 1968 to February 1970. Mrs. Lindsay did not return to Doctor Harris for an examination between March 1968 and February 1970.

Mrs. Lindsay testified that between March 1968 and February 1970 she received her supply of Ortho-Novum 2 mg. by going to her pharmacy as and when necessary and asking for a refill of Doctor Harris' last prescription which the pharmacy had on record. Mrs. Lindsay further testified that she had no difficulty procuring the pills in this manner until February 1970 when the pharmacist told her that she needed a new prescription and after which she went to Planned Parenthood.

Doctor Van Son's prescription of Ortho-Novum 2 mg. for Mrs. Lindsay was put into evidence. In his closing argument plaintiff's counsel directed the jury's attention to the left-hand corner of Doctor Van Son's prescription where there were four boxes for four refills of the prescription. Plaintiff's counsel also noted that the approximately two-year period between March 1968 and February 1970, when Mrs. Lindsay was told that she needed a new prescription, corresponded almost exactly to four six-month refills of Doctor Harris' last prescription. Plaintiff was unable to produce the pharmacy's copy of that last prescription from Doctor Harris. However, plaintiff explained her failure to produce that copy of Doctor Harris' prescription by evidence that the pharmacy did not keep records going as far back as the time here in question. In addition, one of defendant's witnesses, Doctor Fuchs, testified on cross-examination that in his experience it was common practice for a pharmacist to call a doctor on the telephone because one of the doctor's patients had gone to the pharmacy seeking a refill of a prescription and to get the doctor's permission over the phone to refill the prescription. Based on this evidence, plaintiff's counsel asked the jury to infer, and this court finds that the jury reasonably could have inferred, that between March 1968 and February 1970 Mrs. Lindsay got her supply of Ortho-Novum 2 mg. by getting refills of her original September 1967 prescription from Doctor Harris and that those refills were obtained in an appropriate manner.[11]

10. Indeed, defendant did urge these characterizations of the evidence upon the jury in its closing argument.

11. Defendant notes that neither Doctor Harris' office records introduced at trial nor Doctor Harris' deposition testimony indicate that Doctor Harris ever authorized a refill of Mrs. Lindsay's September 1967 prescription. The absence of such evidence, however, was not, by itself, conclusive, but rather was for the jury to evaluate together with all other relevant evidence, including evidence as to the common practice of physicians authorizing refills by telephonic communication with the pharmacy, in determining the circumstances under which

Defendant notes that every package of Ortho-Novum 2 mg. bears the legend: "Caution: Federal law prohibits dispensing without prescription."[12] But the evidence indicated above permits the inference that even in the period between March 1968 and February 1970, Mrs. Lindsay's use of Ortho-Novum 2 mg. was pursuant to a prescription—a prescription which Mrs. Lindsay simply had refilled in an appropriate and customary manner.[13]

The evidence also indicates that, although Mrs. Lindsay did not return to Doctor Harris for an examination between March 1968 and February 1970, she did during that period of time go to see Doctor Weingarten, her family physician. Further, Mrs. Lindsay testified that Doctor Weingarten knew that she was taking birth control pills.[14] And there is no evidence that anyone ever told Mrs. Lindsay that while she was on the pill it was important that she return to her prescribing, as opposed to some other, physician for periodic examinations.

Moreover, with regard to the question of the reasonably foreseeable dangers of Mrs.

Lindsay's actions in obtaining the pill as she did between March 1968 and February 1970 and in failing to return to her prescribing physician for an examination during that period, the jury could reasonably have considered the nature of the particular drug at issue in this case. In contrast with most other prescription drugs, birth control pills are not prescribed primarily for therapeutic purposes to combat disease.[15] In that connection, the impetus behind the use of the birth control pill is more often consumer demand than medical advice based upon independent, informed medical opinion. *See generally*, Note, Liability of Birth Control Pill Manufacturers, 23 Hastings Law Journal 1526 (May 1972). In addition, the jury could reasonably have considered the evidence of widespread publicity promoting the use of the oral contraceptives to the general public in the mid-to-late 1960's and the evidence presented at trial suggesting that in the period between March 1968 and February 1970 the public in general and pill users in particular were not fully informed of the serious health-related side effects potentially associated with use of the pill.

Mrs. Lindsay obtained defendant's drug during the period between March 1968 and February 1970.

Further, the question of whether Doctor Harris ever authorized refills of Mrs. Lindsay's earlier prescription was only one factor which the jury may properly have considered in deciding the issues of Mrs. Lindsay's contributory negligence and product misuse. It was for the jury to determine whether considering all the circumstances, including the nature of the particular drug in question and the reasonably foreseeable dangers of the use of that drug, Mrs. Lindsay acted with reasonable care for her own safety in obtaining Ortho-Novum 2 mg. between March 1968 and February 1970.

**12.** In that connection and in response to additional assertions advanced by defendant in its moving Memorandum, it is worth noting that it is not what the administrative agency intended when it designated Ortho-Novum 2 mg. as a prescription drug which is most relevant to the issues of Mrs. Lindsay's contributory negligence and product misuse, but rather what Mrs. Lindsay herself reasonably should have determined from that designation and from the resulting cautionary label.

**13.** In this respect the instant case is distinguishable from both *Kaspirowitz v. Schering Corp.*, 70 N.J.Super. 397, 175 A.2d 658 (1961);

and *Oppenheimer v. Sterling Drug, Inc.*, 7 Ohio App.2d 103, 219 N.E.2d 54 (1964), cited by defendant in its moving Memorandum.

In *Kaspirowitz, supra*, the plaintiff obtained the allegedly injury-producing medication from a druggist without ever having obtained any prescription for that medication from a doctor. In *Oppenheimer, supra*, the plaintiff refilled the prescription for the drug Aralen for a period well in excess of the period for which the legend on the prescription indicated that the prescription was refillable. In this case, by contrast, as stated in the text, the evidence permits the inference that plaintiff refilled the prescription for an allowable period of time.

**14.** This circumstance also distinguishes the instant case from that of *Oppenheimer v. Sterling Drug, Inc., supra*, in which the court stated that in the course of the two-and-one-half-year period over which plaintiff refilled her prescription approximately twenty times there was an extended period of time in which she was "completely out of touch with her attending physician," 219 N.E.2d at 59, and in which there was no indication that plaintiff saw any physicians at all during that period of time.

**15.** *See*, for example, the testimony of Doctor Hillabrand, Tr. Dec. 8, 1978, pp. 382–83.

While defendant requested and obtained an instruction to the jury in connection with the issue of the adequacy of its warnings stating that the drug company had no duty to warn users of the pill directly of the dangers associated with the drug, the lack of warning, and other evidence bearing on the users' knowledge at the relevant time of the dangers of the pill could properly be taken into account by the jury in considering plaintiff's contributory negligence.

Whether the evidence just summarized warrants the characterization that during the period from March 1968 to February 1970 Mrs. Lindsay, who testified that she simply asked the pharmacy to refill Doctor Harris' previous legitimate written prescription for Ortho-Novum 2 mg., "self-prescribed" or "self-administered" the drug as defendant asserts or whether the evidence warrants the characterization that during that same period the use of the pill by Mrs. Lindsay, who went to her family physician for examinations was "unsupervised" was for the jury to determine. More to the point, this court finds that the evidence as outlined above supports a finding by the jury that throughout the relevant period of time and considering the then-reasonably foreseeable dangers of the use of this non-therapeutic drug, Mrs. Lindsay acted with reasonable care for her own safety, obtaining her supply of Ortho-Novum 2 mg. in a manner which appeared regular to her and reporting to a doctor for periodic examinations, although not to the doctor who prescribed the pill for her.

In addition, defendant overlooks the question of whether, even assuming, contrary to this court's determination, that the only possible conclusion from the evidence was that Mrs. Lindsay did not exercise reasonable care for her own safety, that failure to exercise reasonable care could be said to have been a proximate cause of Mrs. Lindsay's injuries. The evidence indicates that Mrs. Lindsay did not experience any new symptoms related to her use of the pill in the period between March 1968 and February 1970. Further, the evidence supports the inference that there was nothing about the information being made available to the medical profession in that period which would have caused Doctor Harris to discontinue Mrs. Lindsay's use of the pill had she gone to see him. Thus, the evidence would support a finding that any failure by Mrs. Lindsay to exercise reasonable care for her own safety was not a proximate cause of her injuries.

Defendant next asserts that errors in the court's instructions to the jury on the issues of contributory negligence and product misuse require a new trial. It is defendant's view that the court's instructions effectively dictated a finding of no contributory negligence and no product misuse. However, having considered the instructions as a whole and taking into account defendant's particular objections, the court concludes that the instructions properly conveyed to the jury the determinations which it had to make in deciding the issues of contributory negligence and product misuse. Thus, the jury was told that:

"A plaintiff must exercise that degree of care for his or her own safety that a reasonably prudent person would have exercised under the same circumstances, taking into account the reasonably foreseeable dangers. If you find that plaintiff has not exercised such reasonable care for her own safety, she may not recover anything if you find that negligence on her part was a substantial factor in bringing about the injuries she suffered."

Tr. Dec. 21, 1978, pp. 37–38. In addition, the court summarized defendant's contentions as to why the jury should find that Mrs. Lindsay was contributorily negligent.

Defendant's specific assertions of error address themselves to the language of one portion of one sentence of the court's instructions in which the court stated:

"Now, in considering whether Mrs. Lindsay was contributorily negligent because for a period she took the drug Ortho-Novum 2 without a new prescription and without returning to her prescribing physician for an examination, if you find that to be the fact, you must

consider what Mrs. Lindsay knew, or in the exercise of reasonable care should have known *as a lay person, and not as an expert at that time*, about the dangers inherent in the *drug with regard to injuries such as those she suffered*, . . ."

(Emphasis added to correspond to defendant's objections.)

The language "with regard to injuries such as those she suffered" was intended simply to focus the jury's attention on the "reasonably foreseeable dangers" which, in light of the evidence of some of the warnings plaintiff was said to have received from Doctor Harris, the jury might properly consider that plaintiff in the exercise of reasonable care should have taken into account in regulating her conduct. That the interpretation which defendant now places on that language—as limiting the jury's consideration to what Mrs. Lindsay knew or should have known about the specific risk of suffering a CVA—was not that conveyed naturally by the language at the time of the giving of the jury instructions, is strongly indicated by the fact that, as noted below, the language elicited no objection from defendant's counsel after the charge was given and before the jury retired to begin its deliberations. Moreover, defendant's objection appears rather academic inasmuch as, aside from the evidence of the warnings given by Doctor Harris, and aside from the 1967 Patient Booklet, Plaintiff's Exhibit ("PX") 208, which defendant asserts should not have been admitted into evidence, see discussion of that evidence in Section X, *infra*, there was very little if any evidence presented at trial with regard to information which Mrs. Lindsay knew or should have known concerning the general dangers associated with the pill. With regard to the language "as a lay person and not as an expert at that time," neither the case law cited by defendant in this connection nor common sense indicates why the court should have distorted the facts of this case and have implied that Mrs. Lindsay was anything other than a lay person and not an expert.

But there is further reason why the alleged errors in the court's instructions to the jury on the issues of contributory negligence and product misuse raised by defendant on this motion do not warrant a new trial—namely, that defendant, as noted above, never raised any objections to these alleged errors in court before the jury retired to consider its verdict. The only objection defendant made to the instructions on contributory negligence and product misuse after hearing the court's charge and before the jury retired was that the court should have instructed the jury that contributory negligence and product misuse had been established, at least partially, as a matter of law:

"We claim that the jury should be charged that, if they find that Mrs. Lindsay was taking this drug without a prescription during the period March 1968 to February 24, 1970, that constitutes misuse or contributory negligence as a matter of law, and that they are then to consider whether or not such contributory negligence is a proximate cause of her injury."

Tr. Dec. 21, 1978, p. 59. Defendant never asked the court to explain or clarify for the jury any portion of or language in the charge which the court had given—something which the court easily could have done, for example, with respect to the language "with regard to injuries such as those she suffered" if defendant really was concerned at the time that the jury might erroneously have gotten the impression that it could not find Mrs. Lindsay contributorily negligent unless a reasonable person in her position would have foreseen as associated with the use of the pill a risk of the precise type of harm Mrs. Lindsay suffered—namely, a CVA—as opposed to a risk of serious injury in general. Nor does this court find that the errors in the instructions now alleged by defendant involve matters so fundamental and so critical to the jury's verdict that, despite defendant's failure properly to raise those alleged errors at the appropriate time during the trial, they might now serve as a basis for setting aside

the jury's verdict. Under these circumstances, both the case law and the Federal Rules indicate a new trial should not be granted. *See, e. g., Palmer v. Hoffman*, 318 U.S. 109, 119–20, 63 S.Ct. 477, 87 L.Ed. 645 (1943); *Spring Co. v. Edgar*, 99 U.S. 645, 659, 25 L.Ed. 487 (1878); *Spano v. Koninklijke Rotterdamsche Lloyd*, 472 F.2d 33 (2d Cir. 1973); Rule 51, Fed.R.Civ.P. As stated by the United States Supreme Court in *Palmer v. Hoffman, supra*:

> "In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial. . . ."

318 U.S. at 119, 63 S.Ct. at 483.[16]

■ In sum, this court finds that the issues of contributory negligence and product misuse were properly issues for the jury, that the evidence supports a finding that Mrs. Lindsay was not contributorily negligent and had not engaged in product misuse, and that the objections which defendant now raises to the language of the court's instructions on the issues of contributory negligence and product misuse do not warrant a new trial.

#### IV

Defendant next argues that Mrs. Lindsay's action was time-barred as a matter of law. Alternatively, defendant argues that the court's instructions with regard to the statute of limitations defense were erroneous and require a new trial.

Defendant's argument, that Mrs. Lindsay's action was time-barred as a matter of law, is essentially two-fold: First, defendant asserts the time-bar is established by what defendant characterizes as the theory of recovery advanced by plaintiff herself— namely, that the CVA which Mrs. Lindsay suffered in January 1971 was a manifestation of a disease which had first manifested itself in 1966 and 1967 when Mrs. Lindsay experienced tingling and numbness sensations identified by expert witnesses at trial as Transient Ischemic Attacks ("TIA's")[17] and which disease must have been in existence since at least the time of those TIA's. Secondly, stating its argument in a somewhat different manner, defendant asserts that the testimony of plaintiff's own expert witnesses establishes that Mrs. Lindsay sustained "injury" in the sense in which that term is used in the applicable New York case law at least as of the time of the 1966–67 TIA's and that accordingly, her action which was not commenced until October 13, 1972, is time-barred. In support of this two-fold argument, defendant cites a statement made by plaintiff's counsel "at the start of the trial," as well as excerpts from the testimony of two of plaintiff's expert witnesses, Doctors Rosen and Gross.

As this court views the instant action, the statute of limitations issue was not most appropriately analyzed in terms of a "disease" and accordingly, the court did not instruct the jury in those terms. The fact that plaintiff's counsel himself may have used the language of "disease" in discussing the case with the court outside the presence of the jury, or even in argument to the

**16.** Defendant also cites on p. 36 of its moving Memorandum a passage from this court's charge on an entirely separate element of plaintiff's claim as compounding the alleged error in the court's instructions on contributory negligence and product misuse. Defendant, however, has misinterpreted the cited passage. The defect to which the court referred in that passage and which the court stated defendant did not contend plaintiff herself should have discovered was not, as defendant suggests, the danger of risks and side effects attendant upon the use of the drug, but rather the alleged inadequacy of the warnings to the medical profession. Indeed, from the outset of its instructions the court defined and discussed the concept of a defective product for purposes of this case as involving a product which either was not accompanied by adequate warnings or which had not been properly tested.

**17.** According to the testimony of Doctor Rosen, one of plaintiff's medical expert witnesses, "ischemic" means due to impaired blood flow, and a TIA is a lesser degree of the same phenomenon responsible for CVA's.

jury,[18] is largely irrelevant because it is the evidence itself, not statements of the lawyers regarding the case or the evidence which the finder of fact is admonished to consider in resolving disputed factual issues. The evidence in this case indicates that Mrs. Lindsay suffered permanent, serious and irreversible physical impairments in January 1971 as the result of a CVA. Plaintiff's medical expert witnesses, particularly Doctor Rosen, testified to an underlying *process* associated with the use of oral contraceptives and culminating in the CVA [19]—a process to which counsel and the witnesses throughout the trial attached the designation "disease" although Doctor Rosen specifically objected on at least two occasions to use of the word "disease" to characterize that underlying process (Tr. Dec. 7, 1978, pp. 164–65, 184–85). To elevate the underlying process, no matter how characterized, to primacy and to speak of the instant case in terms of a "disease" in the opinion of the court is to ignore the reality of the January 1971 CVA as a discrete phenomenon analytically and logically separable from any underlying process and established by the evidence as the immediate precipitating cause of the physical impairments which caused plaintiff to institute this action.

 Thus, this court deemed it appropriate when the question was first raised during the trial and continues after further consideration on this motion to deem it appropriate to analyze the statute of limitations issue in the more traditional terms of what the evidence indicates as to the time at which the injury suffered by Mrs. Lindsay and forming the basis of her action occurred. Under New York law the limitations period with respect to a claim for products liability, the claim under which the instant case was submitted to the jury, begins to run at the time of injury. *Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275 (1975). As a defense to plaintiff's cause of action, it was defendant's burden to establish by a preponderance of the evidence that the injury on account of which Mrs. Lindsay was suing existed prior to the commencement of the limitations period which in this case was fixed at October 1968 pursuant to defendant's requested jury instructions.[20]

 Under New York law, as defendant notes, injury need not be perceptible in order to start the running of the statute of limitations. Defendant cites the case of *Schwartz v. Heyden Newport Chemical Corp.*, 12 N.Y.2d 212, 237 N.Y.S.2d 714, 188 N.E.2d 142, *cert. denied*, 374 U.S. 808, 83 S.Ct. 1697, 10 L.Ed.2d 1032 (1963), in which

18. Contrary to the impression which may be conveyed by defendant's moving Memorandum, however, the one statement by plaintiff's counsel to which defendant repeatedly refers as indicating plaintiff's theory of recovery was not made in argument to or before the jury. Rather, the statement was made in the course of discussions with the court before the actual commencement of the trial and prior to the selection of the jury. In addition, it might be noted that a position contrary to that suggested in the statement quoted by defendant was taken by plaintiff's counsel at the pre-charge conference when the court and counsel for both sides discussed the instructions to be given to the jury.

19. The nature of this process as indicated by the relevant testimony is discussed in the text *infra*.

20. Apparently, the reason defendant selected for the commencement of the limitations period a date four years, rather than three years prior to the commencement of defendant's action, although a three-year period is indicated for products liability claims, is that another claim asserted by plaintiff in this action, but not in terms submitted to the jury, was for breach of implied warranty, a claim for which a four-year limitations period is indicated. *See* U.C.C. § 2–725. Even after this court indicated that it would submit plaintiff's case to the jury in terms solely of the products liability claim and not in terms of any other theory, defendant made no request that this court use a date other than October 1968 in its statute of limitations charge. Indeed, even after the charge was given, defendant raised no objection to use of the October 1968 date and does not, even now, question, at least directly, the use of the October 1968 date. In any event, in terms of the evidence argued by defendant as establishing a time-bar, evidence pertaining to occurrences in 1966 and 1967, it could have made little difference to the jury's resolution of the proffered defense whether an October 1969 or October 1968 date was used as the commencement of the limitations period.

the New York Court of Appeals speaks in terms of an action accruing "when there is some actual deterioration of a plaintiff's bodily structure." 12 N.Y.2d at 217, 237 N.Y.S.2d at 717, 188 N.E.2d at 144. Defendant also cites the earlier New York case of *Schmidt v. Merchants Despatch Transportation Co.*, 270 N.Y. 287, 200 N.E. 824 (1936), in which the plaintiff alleged that while in the employ of the defendant he inhaled foreign substances in the form of dust and as a result, contracted a disease of the lungs known as pneumoconiosis. In *Schmidt, supra,* the New York Court of Appeals held that the limitations period began to run as of the date the plaintiff left the defendant's employment and thus last inhaled the allegedly injurious substance and not as of a later date when those substances resulted in a disease of the lungs which could be diagnosed.

Proper analysis of the time of injury in the instant case in the opinion of this court requires consideration of the following evidence:

According to her own testimony, Mrs. Lindsay used defendant's drug continuously for a five-year period from 1965 to 1970 with the exception of a period of approximately one month's duration.

The evidence indicates that Mrs. Lindsay's January 1971 CVA resulted in paralysis and impairment of physical functioning on the left side of her body. The evidence further indicates that the functioning of the left side of the body is controlled by the right side of the brain suggesting, as the medical experts testified, that the origins of Mrs. Lindsay's CVA lay in a phenomenon occurring in the right part of the brain.

As previously stated, Doctor Rosen, one of plaintiff's expert witnesses, testified to an underlying process associated with the use of oral contraceptives which culminated in Mrs. Lindsay's January 1971 CVA. In summary, Doctor Rosen testified that oral contraceptives cause increased platelet stickiness and platelet clumping leading to platelet agglutination to the walls of the blood vessels and causing a roughening of the intimal or inner lining of the walls of

the blood vessels. As a result of the roughening of the intimal or inner lining of the walls of the blood vessels, Doctor Rosen further testified, there is turbulent blood flow past that area resulting in additional changes in the vessel wall leading to focal lesions and eventually resulting in the occlusion of the vessel. The process described by Doctor Rosen was one operating in a localized manner on particular areas of the vascular system. Doctor Rosen distinguished that process from the more general process associated with atherosclerosis. In the one brief excerpt from his lengthy testimony cited by the defendant, Doctor Rosen states that to result in an occlusion of a vessel of the size and type of the vessel the occlusion of which resulted in Mrs. Lindsay's CVA, a process such as he described undoubtedly had been in progress with respect to that vessel for some time. Specifically, Doctor Rosen estimated that the process in the right carotid artery, the occlusion of which caused Mrs. Lindsay's stroke, had been in existence for a minimum of a year prior to the January 1971 CVA, or at least since January 1970.

With regard to the hotly litigated issue of the continued effect of past use of oral contraceptives on those who have since discontinued their use, Doctor Rosen testified that the process described by him could continue for some time even after the cessation of oral contraceptive use. Specifically, Doctor Rosen testified that in his opinion the process could continue for one year after the cessation of oral contraceptive use, but that five years was too long a period for the process to continue. Plaintiff stopped taking defendant's oral contraceptives in October 1970 and suffered a CVA in January 1971.

Doctor Gross, the other one of plaintiff's expert witnesses whose testimony defendant cites in this portion of its motion, also testified that the use of oral contraceptives causes permanent changes in the blood vessels, especially in the intima, so that they become subject to areas of roughening where occlusions occur. Further, and more explicitly than Doctor Rosen, Doctor Gross

linked this effect to the *long-term* use of oral contraceptives. As had Doctor Rosen, Doctor Gross testified that past use of oral contraceptives could have a continued effect on ex-users.

With respect to the 1966 and 1967 TIA's on the occurrence of which defendant so heavily relies in pressing its statute of limitations defense, the evidence indicates that those TIA's involved tingling and numbness sensations on the right side of Mrs. Lindsay's body. The evidence further indicates that the functioning of the right side of the body is controlled by the left side of the brain. Doctor Rosen testified that the 1966 and 1967 TIA's were possibly both related to Mrs. Lindsay's use of oral contraceptives. However, Doctor Rosen also testified that because of the opposite sides of the body affected, the 1971 CVA could not have involved the same vessels as the 1966 and 1967 TIA's.

Defendant cites two parts of the testimony of Doctor Gross in support of its statute of limitations defense. One is Doctor Gross' testimony that in his opinion the 1967 TIA was caused by the pill. The other is Doctor Gross' testimony to the effect that in his opinion the right carotid artery occlusion which caused Mrs. Lindsay's 1971 CVA was present from the time of the 1967 TIA and that the 1967 TIA was the first manifestation of the right carotid artery occlusion. However, Doctor Gross also testified consistently with the other evidence presented that because the 1967 TIA affected the right side of Mrs. Lindsay's body, the pathology for that TIA came from the left side of the brain whereas, inasmuch as the 1971 CVA affected the left side of Mrs. Lindsay's body, the pathology for the CVA came from the right side of the brain.

Based on the above evidence, this court believed at the conclusion of the trial and continues to be of the opinion that the jury could reasonably have concluded that the defendant had not met its burden of establishing by a preponderance of the evidence that Mrs. Lindsay's January 1971 CVA had its origins in an injury to her system which existed prior to October 1968.[21]

The evidence of a pill-associated process, which was localized in nature and which affected particular areas of the vascular system, and the evidence that the functioning of each of the two sides of the body is controlled by the opposite side of the brain reasonably support a finding that the 1966–67 TIA's and the 1971 CVA had their respective origins in separate and distinct injuries to Mrs. Lindsay's vascular system. Doctor Gross' testimony suggesting that the 1967 TIA was the first manifestation of the right carotid artery occlusion which resulted in the 1971 CVA was subject to evaluation by the jury just as any other testimony and could reasonably have been discounted by the jury as inconsistent with the other evidence in the case, particularly the evidence indicating that the 1967 TIA had affected the right side of Mrs. Lindsay's body which is controlled by the left, not the right side of the brain. The testimony of Doctor Gross, supported by the testimony of Doctor Rosen, that the 1966–67 TIA's were caused by Mrs. Lindsay's use of oral contraceptives simply suggests a common explanation for both the TIA's and the 1971 CVA and suggests that the fact of the TIA's may reasonably be viewed as supporting Mrs. Lindsay's claim that the CVA was caused by pill-associated effects on her vascular system, but does not require as well a con-

21. Preliminarily, this court notes that it rejects defendant's assertion that the only way the adequacy of the warnings to Doctor Harris could have been relevant to the instant action is if the jury found that Mrs. Lindsay's injury had occurred during the time she was being treated by Doctor Harris and thus in 1967 at the latest. Although the time of alleged wrongful conduct and the time of resulting injury may typically coincide in most cases, it is not *necessary* that they coincide and it is only the injury which must occur within the limitations period for a products liability action, such as this one, to be timely. Accordingly, the jury could reasonably have found the defendant liable because of inadequate warnings to Doctor Harris and *still* have found that plaintiff's injury did not occur prior to October 1968 so long as it found further that the inadequacy of the warnings to Doctor Harris was causally related to Mrs. Lindsay's injury.

clusion that the two occurrences had a common systemic origin in a common injury to Mrs. Lindsay's vascular system.

Further, Doctor Rosen's testimony placed the beginning of the process resulting in the 1971 CVA within the limitations period. Recognizing that Doctor Rosen testified in terms of the minimum amount of time prior to the actual CVA that the process must have begun, the jury may still reasonably have concluded on the basis of his testimony indicating January 1970 as the estimated date of commencement of the process that it could not find that the process leading to the CVA and the resulting injury to Mrs. Lindsay had begun prior to October 1968.

■ Moreover, as this court reads the applicable New York case law and views the relevant evidence, the "injury" giving rise to Mrs. Lindsay's cause of action was not necessarily complete so as to commence the running of the statute of limitations as soon as the oral contraceptives which she was taking initiated the particular process which eventually resulted in the 1971 CVA. The case of *Wright v. Carter Products*, 244 F.2d 53 (2d Cir. 1957), is instructive. In that case plaintiff, Mrs. Wright, alleged that she sustained severe dermatitis in late November 1951 as a result of her use of defendant's deodorant which the evidence indicated she had used since 1946. Defendant moved to dismiss the action as time-barred arguing, *inter alia*, similarly to the arguments advanced by defendant on this motion, that plaintiff's own expert witness

had testified to the effect that "it takes time for an allergic reaction to develop in certain individuals." 244 F.2d at 63. The Second Circuit considered the New York Court of Appeals' decision in *Schmidt v. Merchants Despatch Transportation Co., supra*, and particularly considered the statement in that case that "the injury to the plaintiff was complete when the alleged negligence of the defendant caused the plaintiff to inhale the deleterious dust," 270 N.Y. at 301, 200 N.E. at 827. The *Wright* court tied that statement by the New York Court of Appeals to the latter's subsequent statement that "the disease resulted naturally, if not inevitably, from a condition created in the plaintiff's body through the defendant's alleged wrong," *id.* and offered the explanation that "in the *Schmidt* case the court assumed that once the plaintiff inhaled the harmful dust, he would eventually contract a lung disease, absent some intervening steps of prevention or other 'good fortune'." 244 F.2d at 63. Rejecting the defendant's argument that the *Wright* action was time-barred and distinguishing the situation presented from that presented in *Schmidt, supra*, the Second Circuit stated that there was "substantial support [in the record before it] for the belief that the plaintiff would never have contracted a severe case of dermatitis if she had not applied Arrid to her skin in November 1951." 244 F.2d at 63.[22] It should also be noted that in *Schmidt, supra*, the New York Court

---

22. Defendant's assertions of the inapplicability of the *Wright* case to the instant action were considered but were not found persuasive by this court.

Defendant asserts that the *Wright* case is inapplicable because it "concerned an allergic, i. e., instantaneous reaction to a product and thus has no bearing on this situation where the plaintiff's theory of recovery is predicated on a long-term disease." Putting aside the question of the appropriateness of viewing the instant case in terms of a "disease", a subject previously discussed in the text, defendant's assertion ignores the fact that the defendant in the *Wright* case based its statute of limitations argument at least in part on testimony in that case that "it takes time for an allergic reaction to develop in certain individuals."

Defendant also asserts that, unlike the first rash in the *Wright* case, "[t]he transient ischemic attacks Mrs. Lindsay suffered in 1966–1967 were not . . . a separate, independent reaction to defendant's product which 'fully subsided.'" But the evidence in this case, as noted above, does support a view of the 1966–67 TIA's as occurrences separate and independent from the 1971 CVA. Further, the evidence also supports a finding that by the time of the 1971 CVA, the 1966–67 TIA's had fully subsided. For example, Doctor Gross testified that the 1967 TIA involved a very small area of the left cerebral hemisphere and left no permanent neurological changes. Both Doctors Gross and Rosen testified that the in-depth studies and evaluations of Mrs. Lindsay done at the time of her 1971 CVA revealed no signs of pathology in the left part of her brain.

of Appeals did not hold that the statute of limitations started running upon the plaintiff's first inhalation of the allegedly injurious foreign substances, but on the termination of his employment upon the last possible inhalation of those substances.[23]

In the instant case it was a reasonable inference based upon the evidence that, regardless of when it first began, in order for the process, which had been initiated by Mrs. Lindsay's use of the pill, to reach the dimensions where it would eventually result in a CVA such as Mrs. Lindsay suffered in 1971, the cumulative effect of the use of oral contraceptives over a period of time was required. As previously noted, Doctor Gross explicitly linked the type of permanent vascular changes described both by himself and Doctor Rosen to the long-term use of oral contraceptives. Further, although Doctor Rosen testified that past use of the pill could have a continued effect in ex-users, his testimony also indicated that the effect of past use would not continue indefinitely. Thus, and regardless of what the jury believed as to when the particular localized process culminating in the 1971 CVA had begun, the evidence would reasonably support a finding along the lines of the analysis adopted in *Wright, supra,* that Mrs. Lindsay never would have suffered the 1971 CVA if she had not continued to take Ortho-Novum 2 mg. within the limitations period. Stated somewhat differently, the *Wright* and *Schmidt* cases taken together support the view that Mrs. Lindsay's injury was not complete so as to start the running of the statute of limitations until such point in time as her contemporaneous use of oral

contraceptives had caused such changes in her vascular system as would, without the effect of further oral contraceptive use, have resulted naturally, if not inevitably, in the 1971 CVA and the evidence in this case supports a finding that that point in time occurred within the limitations period.

The above analysis is entirely consistent with the recent New York Court of Appeals' decision in *Thornton v. Roosevelt Hospital,* 47 N.Y.2d 780, 417 N.Y.S.2d 920, 391 N.E.2d 1002 (1979). *Thornton* simply reaffirms the principle first indicated in *Schwartz v. Heyden Newport Chemical Corp., supra,* that when deleterious effects are alleged to result from an injection of chemical compounds into the body, the date of injury is the date of the injection. In contrast to the single, isolated event of an injection of a chemical compound into the body to which injection ultimate deleterious effects are sought to be traced, the instant case involves the continuous daily use of a drug over an almost five-year period under circumstances in which the jury reasonably could have found that the evidence did not establish that the 1971 CVA was causally related to the ingestion of pills prior to the limitations period. The jury could reasonably have found that the pills, the contemporaneous effect of which was to initiate the process leading to Mrs. Lindsay's CVA, were pills ingested during the limitations period. Further, and regardless of the question of when the particular localized process leading to Mrs. Lindsay's CVA began, *Thornton* does not speak to the situation in which the cumulative effect of repeated exposure to a drug over a period of

---

**23.** For an instructive case from another jurisdiction, *see Sterling Drug, Inc. v. Cornish,* 370 F.2d 82 (8th Cir. 1966). In that case plaintiff alleged that she suffered an extensive and permanent impairment of her vision as the result of having taken defendant's drug, Aralen, daily for approximately four years from November 1958 to December 1962. The statute of limitations applied by the court was the two-year Kansas statute of limitations for personal injury actions. The court noted that during the relevant period that statute had been very strictly construed as indicating, similarly to the interpretation of the New York statute of limitations for personal injury actions, accrual

from the time of injury. The defendant asserted that the plaintiff's injury occurred in the late spring of 1961, when appellee first noticed a very small "golden light" which did not interfere with her vision. However, the Eighth Circuit, characterizing the 1961 episode as a transient disturbance, rejected defendant's statute of limitations defense stating that "[t]here is no evidence that [plaintiff] suffered irreversible impairment of vision before June 1962, when she barely avoided an automobile accident after failing to see another car, nor that she could have maintained a cause of action for permanent eye injury prior thereto." 370 F.2d at 86.

time may reasonably be found to have been necessary to produce the injury forming the basis of the suit. The statement in *Thornton* that "the injury occurs upon the drug's introduction", 47 N.Y.2d at 781, 417 N.Y. S.2d at 922, 391 N.E.2d at 1003, must be understood in the context of that case in which there was a single introduction, via a single injection of the drug into the body. The decision in *Schmidt, supra,* placing the commencement of the limitations period at the last, as opposed to the first, time the plaintiff inhaled the allegedly injurious substance precludes an argument that, in the context of a case such as this one, involving the repeated and long-term use of a drug, the *Thornton* court's statement can be read to indicate that the limitations period commences on the *first* introduction of the drug into the body regardless of the causal relationship of that initial drug use to the eventual injury and regardless of the effect on that eventual injury of subsequent use of the drug.

■ It was in accordance with the analysis suggested by the *Wright* and *Schmidt* cases that this court instructed the jury that it could reject the statute of limitations defense if it found that Mrs. Lindsay's stroke resulted from, or was contributed to by the continued ingestion of pills after 1967.[24] The language of "contribution" to which defendant raises an objection was used to cover the situation of pill use which had not initiated the process resulting in the 1971 CVA but the cumulative effect of which the jury might reasonably find to have been necessary to the continuation of that process. Further, the language of "contribution" does not negate the concept of "proximate cause", but rather is fully

consistent with the well-established proposition that there may be more than one proximate cause for any particular injury. Thus, this court finds that the evidence, viewed as it must be most favorably to plaintiff, permits a conclusion other than that defendant established its statute of limitations defense. In addition, this court rejects the assertion that error in its instructions to the jury on the statute of limitations issue require a new trial.

### V

Defendant's fifth argument is that it is entitled to a verdict because its warnings were adequate as a matter of law. In that connection, defendant asserts that the only warnings the adequacy of which was properly in issue in this case were the June 1968 and January 1970 package inserts. Defendant makes that assertion notwithstanding that the evidence also included the December 1965, December 1967, April 1968 and May 1970 package inserts and that plaintiff offered expert testimony as to the inadequacy of those warnings as well as of the June 1968 and January 1970 package inserts, and notwithstanding the fact that the evidence indicated that Doctor Harris first prescribed the pill for Mrs. Lindsay in 1965, that Mrs. Lindsay exhibited symptoms in 1966 and 1967 which the testimony suggested may have been related to her use of the pill and which the jury could reasonably have found were indications of the susceptibility of her vascular system to the type of pill-associated process which resulted in the 1971 CVA, and that Mrs. Lindsay continued taking the pill until sometime in October 1970 and did not have the CVA until January 1971.

---

24. This court's several references to the year 1967, rather than to October 1968 in its instructions on the statute of limitations defense stemmed directly from the nature of defendant's argument in asserting that defense. It was defendant's argument—and, indeed, its only argument—that Mrs. Lindsay's injury had occurred no later than the time of the last TIA in 1967; no other later possible time of injury such as would also bar Mrs. Lindsay's action was ever suggested by the defendant to the jury, apparently explaining why defendant displayed indifference as to whether this court charged October 1968 or 1969 as the commencement of the limitations period. It could not help but have been apparent to the jury in light of defendant's argument why this court was referring to the year 1967 and this court, therefore, rejects the assertion that confusion of any sort resulted from or was inherent in the court's instructions on the statute of limitations defense. Further, this court's review of its instructions to the jury on this issue fails to reveal any reference to the year 1966.

In support of its assertion that the June 1968 package insert is the first warning, the adequacy of which is properly at issue in this case, defendant maintains essentially that any claim based on the alleged inadequacy of warnings prior to the June 1968 package insert would be time-barred. However, as previously noted, in a products liability action it is the *injury*, not the allegedly wrongful conduct which must occur within the limitations period for the action to be maintained. *Victorson v. Bock Laundry Machine Co., supra.* Although the time of allegedly wrongful conduct and the time of resulting injury may typically coincide, it is not *necessary* that they do so and there may be wrongful conduct which does not result in injury until a later point in time. *See Schwartz v. Heyden Newport Chemical Corp., supra,* 12 N.Y.2d at 217, 237 N.Y.S.2d at 717, 188 N.E.2d at 144 ("the wrong itself is not actionable, the right not violated, and the cause of action non-existent until damage takes place.") Thus, a defendant may be held liable for wrongful conduct preceding the injury and occurring outside the limitations period as long as that wrongful conduct is causally related to the eventual injury which occurs within the limitations period. In the instant case, there is ample evidence to support a finding by the jury of a causal relationship between such inadequacy of warnings prior to the June 1968 package insert as it might have found and the injury giving rise to Mrs. Lindsay's cause of action in the sense that the jury could reasonably have concluded that had those warnings been adequate either the pill would never have been prescribed for Mrs. Lindsay in the first place or one of the physicians whom she saw during that earlier period would have directed Mrs. Lindsay to discontinue her use of the pill. Accordingly, the adequacy of defendant's warnings prior to the June 1968 package insert was very much, and properly in issue in this case and a finding by the jury that those earlier warnings were inadequate may properly have been the basis of a verdict of liability against the defendant.

Defendant offers no reason in its moving Memorandum for not including the May 1970 package insert as among those the adequacy of which is properly in issue in the instant action. This court supposes that the defendant excluded the May 1970 package insert because the evidence did not indicate that Mrs. Lindsay ever obtained a new prescription for the pill after that date. But the evidence clearly does indicate that Mrs. Lindsay continued to take the pill after May 1970, that she phoned Planned Parenthood after May 1970 to get a postponement of her next scheduled appointment and that she was given such a postponement, that Mrs. Lindsay got a two-month refill of her prescription for Ortho-Novum 2 mg. in August 1970, and that, although after her October 1970 appointment at Planned Parenthood Mrs. Lindsay discontinued her use of the pill, she suffered a CVA in January 1971. Based on the above evidence and assuming that the jury found that the warnings in the May 1970 package insert were inadequate, it was a fact issue for the jury relevant to the element of causation whether Mrs. Lindsay could have been benefitted and her injury avoided had the warnings in the May 1970 package insert been adequate.

Consistent with its position that it is immune by virtue of the statute of limitations from any liability on account of warnings prior to the June 1968 package insert, defendant has not offered any argument as to the adequacy of those warnings as a matter of law. In any event, this court finds that based on the evidence presented at trial the adequacy of defendant's warnings prior to June 1968 was properly an issue for the jury and that there was substantial evidence in the record to support a finding that the warnings prior to June 1968 were inadequate. *Cf. McEwen v. Ortho Pharmaceutical Corp., supra* 528 P.2d at 536–37, in which the court held that there was substantial evidence to support a jury finding that the December 1967 Ortho-Novum insert was inadequate.

With regard to the June 1968 and January 1970 package inserts, this court is also of the view that on the basis of the evidence presented the adequacy of those warnings was properly an issue for the jury. Defendant's argument on this motion as to the adequacy of those warnings is argument that was or should have been presented to the jury and presents nothing new to this court for its consideration. Nonetheless, this court will make a few specific comments on the issues raised by defendant's argument. These comments, however, are by no means exhaustive of the conclusions which the jury reasonably could have drawn from the evidence presented at the trial.

First, this court notes that the fact that particular package inserts complied with Federal Food and Drug Administration ("FDA") regulations does not, by itself, establish the adequacy of the warnings. As the jury was instructed, if a manufacturer knows, or has reason to know of greater dangers not included in the package inserts approved or required by the FDA, it may be held liable for failing to give adequate warnings of those additional dangers. *See Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362 (4th Cir. 1975); *McEwen v. Ortho Pharmaceutical Corp.*, supra, 528 P.2d at 534. In addition, the evidence suggests that the drug companies, including the defendant, contributed to the language to be used in the FDA-required labelling.

With respect to both the June 1968 and January 1970 package inserts, the jury could reasonably have concluded based on the evidence and testimony presented that, viewed in their entirety and considering the serious and, indeed, often life-threatening nature of CVA's, each of those two inserts unreasonably toned down and underplayed the statement of the risk of CVA's associated with the pill in such a manner as to render the overall warning of the risk of CVA's transmitted by the respective insert inadequate.

Specifically, with respect to both the June 1968 and January 1970 package inserts, the jury reasonably could have found that the labelling effectively diverted the reader's attention away from the risks of CVA's and towards the risk of relatively less serious varieties of thromboembolic or thrombotic disorders such as thrombophlebitis and pulmonary embolisms. Thus, in the June 1968 package insert the "Adverse Reactions" section differentiated between the risks of thrombophlebitis and pulmonary embolism on the one hand and the risk of CVA's on the other stating with respect to the former that "a statistically significant association" with the use of oral contraceptives "has been demonstrated," while stating with respect to the latter only that "[a]lthough available evidence is suggestive of an association [with the use of oral contraceptives] such a relationship has been neither confirmed nor refuted." Similarly, the discussion of the relevant studies in the January 1970 package insert is bifurcated between thrombophlebitis and pulmonary embolism on the one hand and cerebral thrombosis and embolism on the other. However, the evidence in the case reasonably suggests that thrombophlebitis, pulmonary embolism and CVA's are all attributable to a common underlying mechanism involving abnormal blood clotting [25] caused by the estrogen component of the oral contraceptive pill—a mechanism which the evidence further suggests was understood by the drug company from the pill's inception and certainly at the time of the June 1968 and January 1970 package inserts. Thus, the jury reasonably could have concluded that it was unreasonable to distinguish between the various kinds of thromboembolic or thrombotic disorders in the manner in which defendant had done in the June 1968 and January 1970 package inserts and that the result of that differentiation was to render the warnings in both package inserts

---

**25.** Although Doctor Rosen testified that the immediate cause of Mrs. Lindsay's injury was an occlusion, not a clot, his testimony does reasonably suggest that abnormal blood clotting in the form of increased platelet stickiness did play a role in bringing about Mrs. Lindsay's eventual injury.

with respect to the risk of CVA's inadequate.[26]

In addition, the jury reasonably could have found that the presentation of the relevant studies in both package inserts, but particularly in the June 1968 package insert, unreasonably minimized and downplayed the significance of those studies in terms of the risks of oral contraceptive use which they indicated. Thus, the jury could reasonably have regarded it as significant that the June 1968 package insert stated that:

"The British data, especially as they indicate the magnitude of the increased risk to the individual patient, cannot be directly applied to women in other countries in which the incidences of spontaneously occurring thromboembolic disease may be different."

The significance of the quoted statement lies not in its truth or falsity but rather in the fact that its very insertion at the close of the discussion of the British studies may reasonably be viewed, as suggested in the testimony of plaintiff's expert witnesses, as an unreasonable attempt to undermine the validity of the British studies and as an unreasonable suggestion that the implications of those studies for those using oral contraceptives in this country were not all that significant. Similarly, the jury reasonably could have concurred in the testimony of plaintiff's expert witnesses that the persistent reference to the studies as "retrospective" unreasonably suggested that the studies might not be significant in terms of stating the risks faced by present and future users of the pill. With specific regard to the January 1970 package insert, the jury reasonably could have found that the statement that: "This [a statistical [sic] significant association between cerebral thrombosis and embolism and the use of oral contraceptives] has not been confirmed

in the United States" was significantly misleading and inaccurate in light of the Sartwell studies which had been conducted in the United States. This court cannot accept as a matter of law defendant's assertion that to single out the foregoing statement as inaccurate and misleading is "nitpicking;" rather, that characterization presents a factual issue which was properly for the jury to decide.

Further, the jury might reasonably have regarded it as inadequate that the "Contraindications" sections of both the June 1968 and January 1970 package inserts spoke only in terms of past or existing conditions such as "cerebral apoplexy" which had actually been diagnosed without indicating that it might also be advisable for doctors to make inquiries of their patients concerning past "manifestations of thrombotic disorders," language which is used in the "Warnings" sections with reference to future, but not past symptomology.

■ Defendant spends a considerable amount of time in this portion of its motion setting forth statements emanating from sources other than itself with regard to the oral contraceptive-associated risks of thromboembolic disorders in general. For example, defendant cites rather extensively from two "Dear Doctor" letters sent out by the FDA. But information sent out separately by the FDA can, in no way, relieve Ortho of its obligation to give adequate warnings of the risks of its product. Insofar as such FDA "Dear Doctor" letters may bear on the question of the independent knowledge possessed by the various physicians, those letters were properly discussed, not in connection with this, but in connection with the first point of defendant's present motion.

---

**26.** Whether or not physicians actually would have been misled by the bifurcated treatment between thrombophlebitis and pulmonary embolism, on the one hand, and CVA's on the other was also a factual issue which the jury, considering the large numbers and various kinds of physicians who might have occasion to look at a package insert, as well as the circumstances and context in which the package inserts might be consulted, reasonably could have determined adversely to the defendant.

Moreover, a comparison between the language used in the two FDA "Dear Doctor" letters and the language used in the June 1968 and January 1970 package inserts is instructive and lends support to a determination by the jury that the language used in the two package inserts to describe the risks of oral contraceptive use, as those risks were relevant to this action, constituted inadequate warnings. Thus, the June 1968 FDA "Dear Doctor" letter states that:

> "there is a definite association between the use of oral contraceptives and the incidence of thromboembolic disorders."

As previously noted, the June 1968 package insert speaks not of a "definite" but rather of "a statistically significant association" between the use of oral contraceptives and thrombophlebitis and pulmonary embolism on the one hand and, with respect to the CVA's, states that "although available evidence is suggestive of an association, such a relationship has been neither confirmed nor refuted." Similarly, the January 1970 FDA "Dear Doctor" letter states unequivocally that:

> "Studies in Great Britain also show increased risk of cerebral thrombosis and embolism in users of oral contraceptives."

By comparison, the January 1970 package insert again speaks in terms of "statistical [sic] significant association."[27] Comparing the quoted language from the FDA "Dear Doctor" letters with the quoted language from the corresponding Ortho package insert, and considering that the two sets of documents were circulated at the same point in time and were meant for consumption by the same expert audience, the jury could reasonably have concluded in accordance with the testimony of plaintiff's expert witnesses that the quoted language

from the package inserts was unreasonably vague and ambiguous and constituted an inadequate warning of the risks associated with defendant's drug.

Even without agreeing with the testimony of plaintiff's expert witnesses that, in terms of the information which it conveyed to the physician, the phrase "a statistically significant association" was essentially meaningless, the jury reasonably could have found that use of such a phrase unduly minimized the serious risks associated with the use of birth control pills and rendered the warnings here at issue inadequate. In addition, the plaintiff's expert witnesses testified that the statement in the June 1968 package insert with respect to the oral contraceptive-associated risk of CVA's that, "although available evidence is suggestive of an association, such a relationship has been neither confirmed nor refuted," was misleading. That testimony also supports a finding by the jury that the June 1968 package insert in particular constituted an inadequate warning of the risks of CVA's associated with the pill.

Accordingly, applying the principles previously stated to be applicable when a party who seeks to set aside an unfavorable verdict makes arguments based on the evidence which was presented at trial, this court is unable to state that without weighing the credibility of the evidence the only reasonable conclusion based upon the evidence and all reasonable inferences therefrom which the jury could have drawn is that the June 1968 and January 1970 package inserts were adequate warnings of the risks inherent in Ortho-Novum 2 mg. To the contrary, this court finds that there was substantial evidence in the record to support a finding that the June 1968 and Janu-

---

**27.** The jury might also reasonably have contrasted the language of the January 1970 FDA "Dear Doctor" letter urging the doctor to make full disclosure to the patient of the potential adverse effects of the pill with the defendant's failure to include a similar urging in its September 1969 "Dear Doctor" letter, or in any other communication issued by the drug company. With regard to defendant's having circulated a copy of the Hellman summary under cover of its September 1969 "Dear Doctor" letter, the

jury might reasonably have concluded that given the seriousness of the risks at issue more was required of Ortho at the time of its September 1969 letter than to simply attach a copy of the Hellman summary for the busy doctor to wade his way through on his own. At a minimum, the jury might reasonably have concluded, that the defendant should, in its covering letter, have highlighted some of the significant information contained in the Hellman summary.

ary 1970 package inserts were inadequate warnings of the risks of defendant's drug. Had the issue been raised, the court would also find sufficient evidence to sustain a finding that the May 1970 package insert was an inadequate warning, although the evidence with respect to this last package insert is perhaps not as strong as the evidence with respect to the earlier ones.

Defendant cites four cases in which courts deemed particular package inserts for both control pills to constitute adequate warnings. Only one of those cases, *Chambers v. G.D. Searle & Co., supra*, note 3, dealt with the equivalent of either the defendant's June 1968 or January 1970 package insert. By defendant's own account, the cases of *Magill v. G.D. Searle & Co., supra*, note 3; and *Goodson v. Searle Laboratories, supra*, note 3, involved the adequacy of package inserts equivalent to the May 1970 Ortho package insert. The case of *Dunkin v. Syntex Laboratories, Inc.*, 443 F.Supp. 121 (W.D.Tenn.1977), involved the adequacy of warnings in the PDR and package inserts for the years 1973 and 1974, a period of time well after the period relevant to the instant action and after Mrs. Lindsay had suffered her CVA.

The decision in each of the four cases cited by defendant was, of course, based on the particular record presented in that case. Thus, even where the same package inserts may be in issue, the significance of those decisions in evaluating the sufficiency of the evidence presented in *this* record to sustain a finding of the inadequacy of those warnings is dubious. But if this court is to attach significance to the decisions of other courts based on different records, the conclusion of the court in *McEwen v. Ortho Pharmaceutical Corp., supra*, in refusing to disturb the jury's verdict in favor of the plaintiff, that it was "unable to hold that the warnings given on the June 1968 Ortho-Novum package insert were, as a matter of law, adequate," 528 P.2d at 537, furnishes support for the action of this court in refusing to set aside the jury's verdict in favor of Mrs. Lindsay. Further, it might be noted that the decision in *Goodson v. Searle Laboratories, supra*, was on a motion for summary judgment, not after a full trial, and that it appears from the decision that plaintiff in that case never based her claim on an assertion that the warnings to the medical profession had been inadequate but rather on an assertion that the defendant had a duty to warn the users of the drug themselves of the risks associated with its use.

One other matter bears comment lest the impression be left that the only basis on which the jury could find defendant's warnings inadequate was the contents of the various package inserts. The evidence indicated that there were various methods of communication with the medical profession available to the defendant in addition to the package inserts. Further, as the jury was instructed, another possible basis for imposing liability on the defendant would be a finding by the jury that considering the dates at which the defendant acquired actual or constructive knowledge of the risks inherent in its drug and considering also the seriousness of those risks, the defendant had not timely communicated information as to those risks to the medical profession. In that connection, the evidence indicates that defendant kept certain of its package inserts in force for considerable periods of time—in one instance approximately two years—without changing their contents.

In sum, this court finds, first, that the adequacy of defendant's warnings throughout the period from December 1965 to January 1971 when Mrs. Lindsay suffered her CVA is properly in issue in this case and, further, that the evidence was sufficient to support the jury's finding that defendant's warnings were inadequate.

## VI

Defendant next argues that a new trial is required because of the court's receipt into evidence of PX 172 and the court's instructions to the jury with respect thereto. That exhibit consisted of a covering letter dated July 17, 1970 from Ortho to a division of the Bureau of Drugs stating Ortho's intent to put in or on future pack-

ages of defendant's product labelling directed to the patient and of an attached draft form of the patient warning label. Defendant asserts essentially that the patient warning label was a subsequent remedial measure and should have been excluded pursuant to Fed.R.Evid. 407.

This court admitted PX 172 into evidence as bearing on the issue of the reasonably foreseeable dangers of defendant's drug and instructed the jury accordingly. Specifically, PX 172 bore on the issue of reasonably foreseeable dangers in at least two respects: (1) as evidence of defendant's knowledge of the risks associated with its drug as of early 1970 when the hearings which gave rise to the proposal for a patient warning label began or at the latest as of July 1970 when the covering letter was written; and (2) as evidence of defendant's knowledge as of early 1970 or July 1970 at the latest of the inadequacy of past warnings as a means of getting the physician to disclose information concerning potentially serious side effects of the pill such as abnormal blood clotting to the patient.

With regard to defendant's knowledge of the risks associated with its drug, PX 172 may reasonably be viewed as indicating that from at least early 1970 on defendant knew that there were interpretations of the medical and scientific data regarding oral contraceptive use indicating that, in the words of the patient warning label, "[t]he most serious known side effect is abnormal blood clotting which can be fatal." Defendant's suggestion both during the trial and on this motion that the language of the patient warning label was a deliberate oversimplification designed for communication with the layman was properly a matter of argument to the jury and not a reason for excluding this probative evidence of defendant's knowledge of the risks of its drug at that time.

Defendant's characterization of the patient warning label as a *subsequent* measure ignores the evidence that Mrs. Lindsay continued to use the pill through October 1970, getting a two-month refill of her prescription in August 1970 when she also received a postponement of her next scheduled examination at the Planned Parenthood clinic. In addition, as previously indicated the jury could reasonably have concluded based on the evidence in this case that the injury to Mrs. Lindsay was not complete until sometime after early 1970. Thus, the situation presented in the instant case was different than that presented in *Smyth v. Upjohn Co.*, 529 F.2d 803 (2d Cir. 1975), the case cited by defendant, where the warnings which the Second Circuit held it had been within the discretion of the trial court to exclude under the "subsequent repairs" doctrine had been issued *after* the plaintiff's brief use of the drug had ended and *after* the plaintiff had sustained injury.

Because Mrs. Lindsay's use of the pill had not yet ended in early 1970 and because the jury could reasonably find that her injury was not complete until after that time, it was a question for the jury whether based on the knowledge imparted by the patient warning label and the background surrounding its adoption, the exercise of reasonable care required that the defendant in early 1970 or at some point thereafter prior to October 1970 take measures such as changing its package insert or circulating a special "Dear Doctor" letter to impress upon the medical community the seriousness of the pill's potential side effects and the importance of communicating those possible side effects to past as well as future users of the pill. Whether the FDA's January 1970 "Dear Doctor" letter obviated the need for an appropriate communication from the drug company was, again, a question of fact and a matter of argument to the jury. This court also finds that there was a basis for the jury to find that any inadequacy in defendant's warnings after early 1970 was causally related to Mrs. Lindsay's injury. For example, the jury could reasonably have believed that had adequate warnings been given to the medical profession in early and mid-1970, Mrs. Lindsay would not have been permitted to postpone her scheduled August 1970 appointment at Planned Parenthood and would not have been given a two-month refill at that time but would instead have

been told to come in for her scheduled appointment because there was information about the pill which it was important for her to know and to discuss with a doctor. Alternatively, the jury could reasonably have believed that adequate warnings in light of the 1970 patient warning label and the surrounding events would have led Planned Parenthood to accelerate the scheduled appointment dates of those then taking the pill to discuss with them and check for evidence of the potentially serious side effects described. Further, it was a permissible inference from the evidence of the cumulative nature of the process at work in Mrs. Lindsay's vascular system and of the contribution of the pill to that process, that had Mrs. Lindsay been taken off the pill at some point in 1970 prior to October the subsequent CVA might have been avoided.

Defendant asserts that no new information concerning or dangers of oral contraceptives was discovered during the early 1970 period. But the evidence regarding the Nelson Committee Hearings and attendant events indicates that there were during that period new discussions and new analyses concerning the safety of oral contraceptives. At a minimum, that evidence reasonably suggests a new appreciation of the seriousness of the risks posed by the birth control pill as well as a new awareness that the then-existing methods of communicating warnings were leaving many, if not the majority of patients without important information about the possible serious side effects of the pill.

Finally, to the extent that defendant claims prejudice from the use made of PX 172 by plaintiff's counsel in his summation, this court notes that no objection to that use was made by the defendant at the time of the summation. The prejudice which defendant now claims could have been readily cured by a corrective admonition from the court had defendant noted an objection at the relevant time. Further, in light of the substantial evidence on the basis of which this court finds that the jury could reasonably have found defendant's warnings from December 1965 on to have been inadequate, in light of this court's clear instructions to the jury that they were to determine the adequacy of particular warnings on the basis of defendant's knowledge at the relevant time, and in view of this court's repeated admonition to the jury that it was not the arguments of the lawyers but the evidence itself which was to determine the verdict, this court rejects the notion that any serious prejudice could have resulted from a statement such as that made by plaintiff's counsel in his summation.

Accordingly, this court rejects defendant's argument that the receipt into evidence of PX 172 and the court's instructions to the jury with respect thereto either were erroneous or require a new trial.

VII

Defendant also argues that a new trial is required because of the court's receipt into evidence of certain excerpts from Supplement A to the 1978 PDR (the "Supplement"), PX 216. Defendant asserts, first, that to the extent that those excerpts were from that part of the Supplement which reproduced the patient as opposed to the physicians' package insert, they were not properly received as admissions of Ortho. Further, defendant objects to the receipt as an admission of what it refers to as the "Beral reference" in the part of the Supplement containing the physicians' package insert. Finally, defendant maintains that in his summation counsel for the plaintiff referred to an excerpt from the Supplement which had not previously been admitted into evidence and asserts that that reference by plaintiff's counsel was prejudicial.

Contrary to defendant's assertion that four excerpts from the Supplement were admitted into evidence, this court's review of the record indicates that only three such excerpts actually were received in evidence. *See* Tr. Dec. 12, 1978, p. 844; Tr. Dec. 13, 1978, pp. 902–905. Of those three excerpts two were from that portion of the Supplement containing the physicians' package insert. As read to the jury by plaintiff's counsel on December 13, 1978, those two excerpts were the following:

(1) A sentence referring to the Beral study and stating that "This study reports that the increased risk of circulatory diseases may persist after the pill is discontinued." (A 30)

(2) An excerpt from the "Warnings" section of the physicians' package insert headed "Thromboembolic Disorders and Other Vascular Problems" and providing that

"An increased risk of thromboembolic and thrombotic disease associated with the use of oral contraceptives is well established. Four principal studies in Great Britain and three in the United States have demonstrated an increased risk of fatal and nonfatal venous thromboembolism and stroke, both hemorrhagic and thrombotic. . . ."[28] (A 30)

The single excerpt from the portion of the Supplement containing the patients' package insert which was admitted into evidence was the following:

(3) An excerpt under the heading "The Dangers of Oral Contraceptives" which provided that:

"Blood clots (in various blood vessels of the body) are the most common of the serious side effects of oral contraceptives. A clot can result in a stroke (if the clot is in the brain), a heart attack (if the clot is in a blood vessel of the heart). . . ." (A 35)

The fourth excerpt cited by the defendant from the portion of the Supplement containing the patient package insert and headed "Dangers to a developing child if oral contraceptives are used in or immediately preceding pregnancy" was never itself admitted into evidence but was simply referred to in general terms during the cross-examination of defendant's witness, Doctor Derby, with regard to the continued effects of the pill after the patient has ceased using it. See Tr. Dec. 19, 1978, pp. 1986–88. Defendant's objections to this line of cross-examination were neither specific nor consistent. Explicit objections to the prejudicial effect of the otherwise relevant evidence could have been satisfied by an instruction to the jury even beyond the court's *sua sponte* comment that the line of inquiry seemed far afield.

The excerpts from the Supplement which were admitted into evidence were received for their relevance to the issue of causation. That relevance was twofold: first, as bearing on the hotly litigated question of whether past use of oral contraceptives could have a continued effect on women even after they stopped using the pill (excerpt 1) and second, as bearing on the general question of the causal relationship between the use of oral contraceptives and CVA's (all three excerpts, but especially excerpts 2 and 3).

■ That the admission of these excerpts on the issue of causation was proper is supported by a recent decision of the Court of Appeals for this Circuit. In *Ezagui v. Dow Chemical Corp.*, 598 F.2d 727 (2d Cir. 1979), a products liability action against, *inter alia*, Parke-Davis Co., manufacturer of the vaccine Quadrigen, for serious injury suffered by, and the eventual death of an infant child, the Second Circuit noted that reports of adverse medical reactions received by Parke-Davis after the January 18, 1961 vaccination of the child should have been received in evidence. Specifically, the Second Circuit stated that:

---

28. With respect to the second excerpt from the Supplement, there is a discrepancy between what the record indicates plaintiff's counsel read to the jury and what defendant states was admitted into evidence. Defendant states that what was admitted into evidence was an excerpt from the "Adverse Reactions" section of the physicians' package insert which provides that:

"An increased risk of the following serious adverse reactions has been associated with the use of oral contraceptives

Cerebral thrombosis." (A 32)

The discrepancy does not appear to be a material one, however, inasmuch as the basic thrust of both excerpts is the same, with the excerpt read by plaintiff's counsel to the jury going into more supporting details, and inasmuch as both excerpts were taken from the portion of defendant's labelling addressed to the physicians.

"While such later reports were not admissible to prove Parke-Davis' knowledge of defects at the time of vaccination, these later reports should have been admitted to prove the existence of a defect, just as subsequent accident reports are admissible to prove the cause of a car accident." At 735 n.1. Similarly, in this case the excerpts from the Supplement, even though issued after the events in question, were properly admissible to prove a causal relationship between Mrs. Lindsay's oral contraceptive use and her 1971 CVA.

■ Defendant objects that the reference to the Beral study does not indicate that Ortho adopted that article and that the reference therefrom was not properly received as an admission. However, this objection is rather disingenuous since on direct examination of one of defendant's own witnesses, Doctor Derby, defendant elicited a characterization of the same study as demonstrating that there were no after effects of the use of oral contraceptives. It was, hence, entirely proper for plaintiff to attempt to show by an admission, if not the truth of the statements in the Beral article, at least defendant's inconsistent position as to what that article contained. Moreover, having relied on the "learned treatise" to establish one proposition from the article as the fact on Doctor Derby's direct examination, defendant could hardly object to the use of the reference to the Beral study to establish the truth of the article's content as characterized in its 1978 Supplement. Defendant also objects that the Beral article dealt with "circulatory diseases" in general and not with the risk of cerebral thrombosis which they assert was the issue in this case. The significance of that distinction, however, was properly a matter of argument to the jury and not something requiring the exclusion of the evidence altogether.

Contrary to defendant's assertion, there was a difference between the language used in the January 1970 package insert and the language in either the "Warnings" or "Adverse Reactions" sections of the 1978 physicians' package insert. Specifically, the 1978 package insert did not use the phrase "a statistically significant association" which plaintiff vigorously contended throughout the trial was in this context a misleading and meaningless phrase. Therefore, this court did not and does not regard the relevant excerpt from the 1978 package insert as being merely cumulative of earlier evidence with respect to the issue of causation.

Defendant's objection that language from the 1978 patient as opposed to physicians' package insert should not have been received in evidence as an admission against Ortho is based on the receipt in evidence of a single excerpt from the Supplement. Defendant appears to base its argument on a contention that the patient warning label was required by law. However, defendant offered no evidence with respect to the 1978 patient warning label, as it had with respect to the 1970 patient warning label which the court did not receive in evidence as an admission, that Ortho had objected to the language used therein.

■ In discussing statements made under a statutory duty, Professor Wigmore states:

"Admissions made under a *duty imposed by law* stand on a peculiar footing. It would seem that nothing in the principles governing admissions excludes them. But they may nevertheless come to be excluded on two other principles:

(a) The statutes imposing such a duty usually require the statement in the shape of a *report to a public official*, e. g., a druggist's record of sale of poison, a corporation's report of assets, a common carrier's report of an injury done. In such cases the statute sometimes makes the communication confidential and expressly brings it under a privilege . . . Without such express provision, the privilege might be implied, where policy obviously required it."

IV Wigmore on Evidence § 1050 (emphasis in original). The cases differ with respect to the implication of such a privilege as a matter of policy. *Compare Farner v. Paccar, Inc.*, 562 F.2d 518 (8th Cir. 1977) (recall

notice sent out under compulsion of law admissible) *with Vockie v. General Motors Corp., Chevrolet Div.*, 66 F.R.D. 57 (E.D. Pa.), *aff'd*, 523 F.2d 1052 (3d Cir. 1975) (recall notice sent out under compulsion of law inadmissible). Further, in the absence of evidence of compulsion, not only with respect to the issuance of the 1978 patient warning labels, but with respect to the specific language used in that label, this court regards the case of *International Paper Co. v. Delaware & H.R. Corp.*, 73 F.Supp. 30 (N.D.N.Y.1938), the only case from this Circuit cited by defendant on this point, as inapplicable to the particular question of admissibility of evidence here being addressed.[29] Even assuming, however, that it was error to receive in evidence language from the 1978 patient package insert as an admission of Ortho, that error was clearly harmless in view of the sizeable amount of other evidence introduced at trial on the issue of causation.

■ With regard to language taken from the portion of the Supplement containing the patient, as opposed to physicians' package insert, defendant also repeats its earlier objection directed to the 1970 patient warning label that such language was a deliberate oversimplification designed for communication with the layman. Again, the significance of the fact that particular language was meant for lay, and not expert consumption was properly a matter of argument to the jury.

The jury was specifically instructed that it was to consider the excerpts from the Supplement only with respect to the issue of causation and not with respect to the issue of the adequacy of defendant's earlier warnings. Thus, the court charged the jury that:

"Now, the evidence in this case included the reading of certain excerpts from the 1978 package insert for Ortho-Novum 2. This evidence was admitted only on the issue of whether or not the drug, in fact, caused plaintiff, Mrs. Lindsay's inju-

ries, which as you shall see is another issue which you must address in your consideration of the case. The 1978 package insert was not admitted on the issue of whether defendant's warnings to the medical profession prior to 1970, eight years ago, the date on which Mrs. Lindsay stopped using the pill, were adequate, and you should not consider it on the question."

Tr. Dec. 21, 1978, pp. 21–22. Accordingly, defendant could not properly claim prejudice in terms of the jury's having considered any of the excerpts from the Supplement with respect to the issue of the adequacy of defendant's earlier warnings.

■ Finally, with respect to plaintiff's counsel's reference on his rebuttal summation to one excerpt from the patient package insert portion of the Supplement, which apparently had not previously been admitted into evidence, defendant did not bring that circumstance to the court's attention at the time of the rebuttal summation when this court could easily have taken corrective action, but only now makes that circumstance known to the court. Defendant's explanation for its failure timely to bring this matter to the court's attention—namely, that "the damage was irrevocable" and that "to object would have been to underscore the prejudice"—is unconvincing, especially since this court finds little, if any, prejudice to the defendant from the reading of the relevant excerpt which first, refers to a phenomenon which the evidence clearly indicated was not involved in this case—a stroke due to rupture of blood vessels in the brain—and which next appears to refer to the Beral study in terms quite similar to the reference to that study in the excerpt from the physicians' package insert which was admitted into evidence.

Accordingly, this court rejects defendant's argument that either the receipt in evidence of, or references during the trial to excerpts from the Supplement, either singly or in combination, requires a new trial.

---

**29.** Whereas defendant now cites a section of the Federal Register which it asserts mandated the language in the patient warning label, no

such specific evidence was presented to the court during the trial when the determination of the admissibility of the evidence was made.

## VIII

Next, defendant argues that a finding that Mrs. Lindsay's use of the Ortho-Novum 2 mg. oral contraceptives caused her 1971 CVA is against the overwhelming weight of the competent evidence and requires a new trial.

However, this court concludes that there was substantial, competent and convincing evidence on the basis of which the jury could find a causal relationship between Mrs. Lindsay's oral contraceptive use and the 1971 CVA. In particular, the testimony of Doctor Rosen describing the process which in his expert opinion was initiated and contributed to by oral contraceptive use and which culminated in the 1971 CVA, stands out in the mind of this court from among all the expert testimony offered by either side at trial as thoroughly credible and convincing.

Defendant makes much of the fact that Doctor Rosen did not point to any one article from the medical literature as a source for his theory of causation in its entirety. But there was substantial support in the record for the various component parts of Doctor Rosen's theory of causation. Thus, Doctor Rosen himself cited several articles which supported his assertion of platelet stickiness as a consequence of oral contraceptive use and defendant's own expert witnesses, including, for example, Doctors Mammen and Derby, similarly testified to increased platelet stickiness in women taking the pill. Doctor Rosen also testified without contradiction that there was ample material in the medical literature indicating that turbulent blood flow, which according to Doctor Rosen's theory resulted when the increased platelet stickiness brought about changes in the intimal lining of the walls of the blood vessels, will produce focal lesions of the sort which he had described. Finally, Doctor Rosen's testimony that the process set in motion by oral contraceptive use could continue for some time even after the woman stopped taking the pill is supported both by the logic of the process which he described and by other evidence in the record, including the doctor's own stated clinical experience and the statement in defendant's 1978 physicians' package insert discussed in the immediately preceding section of this opinion to the effect that a study had been done which reported that "the increased risk of circulatory diseases may persist after the pill is discontinued." In this connection, it should be emphasized that, what Doctor Rosen testified could well continue even after the cessation of oral contraceptive use was not the platelet stickiness which he and others identified as an effect of the pill and which the defendant sought to establish as associated only with the contemporaneous ingestion of oral contraceptives, but the ensuing process of turbulent blood flow and effects thereof, which process, according to Doctor Rosen's testimony, had its origins in the effects of platelet stickiness but which, it is reasonable to infer from his testimony, at some point after initially being set in motion is not dependent on continued platelet stickiness for its own continuation.

Defendant also relies heavily on the fact that whereas Doctor Rosen testified to Mrs. Lindsay's injury solely in terms of an "occlusion", another of plaintiff's expert witnesses, Doctor Gross, testified also in terms of a "clot." But Doctor Gross' testimony was fully consistent with Doctor Rosen's testimony in its description of the underlying mechanism at work and specifically, in attributing to the use of oral contraceptives a process initially affecting the intimal lining of the walls of the blood vessels, producing turbulent blood flow and as a result creating further changes in the blood vessels such that either an occlusion alone or a clot and subsequent occlusion could develop. Doctor Gross' testimony also supports that of Doctor Rosen in stating that the process of changes in the blood vessels described by both can continue even after the cessation of oral contraceptive use. In addition, the differences noted by the defendant between the testimony of these two experts need not even be seen as a discrepancy inasmuch as, previously noted, Doctor's Rosen's testimony can reasonably be viewed as identifying abnormal blood clotting in the form of in-

creased platelet stickiness as one factor involved in the process which culminated in Mrs. Lindsay's CVA.

Defendant was given every opportunity to prove its theory that Mrs. Lindsay's 1971 CVA was due to a rare condition called fibromuscular dysplasia and presented numerous expert witnesses who testified to that effect. Obviously, the jury simply did not credit that testimony. The evidence as to the cause of Mrs. Lindsay's CVA is not such that, when viewed most favorably to the plaintiff as it must be on this motion, this court can say, as defendant maintains, that the only reasonable conclusion which can be drawn is that the CVA was due to fibromuscular dysplasia and not to the near continuous use over a five-year period of defendant's oral contraceptives.

■ Finally, contrary to defendant's suggestion that there was an error in the charge to the jury on this point, although that suggested error is not stated as an actual ground in support of the instant motion, this court correctly instructed the jury that it was part of plaintiff's burden to establish by a preponderance of the evidence that it was the use of oral contraceptives which caused Mrs. Lindsay's 1971 CVA. What defendant apparently objects to was the court's further instruction to the jury that "[i]t is not plaintiff's burden to disprove every possible ground of causation suggested by defendant." Tr. Dec. 21, 1978, p. 30. That instruction, however, is fully supported by and indeed comes directly from case law in this Circuit. *See Tinnerholm v. Parke, Davis & Co.*, 285 F.Supp. 432, 440 (S.D.N.Y.1968), *aff'd as modified on damages*, 411 F.2d 48 (2d Cir. 1969).

Accordingly, this court finds that there was substantial evidence on the basis of which the jury could find that defendant's oral contraceptives caused Mrs. Lindsay's CVA.

## IX

In the ninth point in support of its motion, defendant notes what it asserts are miscellaneous errors in the court's charge to the jury which require a new trial.

■ First, defendant objects that the court should not have used the term "watering down" in its instructions to the jury on the issue of the adequacy of defendant's warnings. In what strikes this court as rather peculiar logic, defendant asserts that because that term was frequently used throughout the trial, the court should have completely ignored it in its charge to the jury and should not have given the jury any guidance at all as to the meaning of that term in the context of this case. Further, defendant asserts that the term "watering down" has only one meaning—overpromotion—and that it is improper to give a "watering down" charge when, as in this case, no issue of overpromotion was presented to the jury.

Through documentary evidence, testimony and argument, plaintiff urged throughout the trial as a major, if not the primary, theory of the inadequacy of defendant's warnings that Ortho had deliberately "watered down" its warnings so as to insure that, notwithstanding the possibly serious risks of pill use which defendant knew to exist, doctors would continue giving out prescriptions and women would continue taking the pill. So that the jury could properly evaluate plaintiff's contention in that regard, this court gave an instruction defining the term "watering down" in the manner in which that term was construed in *Tinnerholm v. Parke, Davis & Co., supra* at 451. Thus, the jury was instructed that:

"Watering down the substance of a warning so as to give false assurance to the medical profession that a drug can be safely administered, thereby unreasonably minimizing the danger which exists in the use of a product, amounts to an inadequate warning. If you find that the defendant watered down the warnings in the package inserts for Ortho-Novum 2, that is, unreasonably minimized the reasonably foreseeable dangers which existed, then you may find that the defendant failed to give adequate warnings to the medical profession."

Tr. Dec. 21, 1978, p. 19. Contrary to the implications of defendant's brief, the above instructions did precisely what the court at the pre-charge conference had told counsel for both sides they would do—they defined the "watering down" concept in specific and definite language as an unreasonable minimization of the reasonably foreseeable dangers which existed, thereby *preventing* possible prejudice to the defendant as a result of the jury's attaching invidious connotations to an *undefined* term or metaphor which, because undefined, might cause the jury confusion.

Nothing in the cases cited by the defendant supports the assertion that "watering down" warnings has the same meaning as overpromotion. The promotion of drugs or any other product refers specifically to the sales program conducted by a particular company in an attempt to generate and to maintain the widespread use of its product. *See Love v. Wolf*, 226 Cal.App.2d 378, 38 Cal.Rptr. 183, 193 (1964). ("[Plaintiff] also contends that even conceding a proper warning had been given Dr. Wolf and the rest of the medical profession, such warnings must be deemed cancelled out if *overpromotion through a vigorous sales program* persuaded doctors to disregard the warnings given." (Emphasis added.)) As such, the promotion is separate from the manufacturer's statement of warnings which typically are read after interest in a product has initially been aroused and which typically are designed to regulate the use of the product. Although the cases of *Love v. Wolf, supra,* and *Stevens v. Parke, Davis & Co.*, 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973), cited by the defendant, speak of both the "watering down" of warnings and of "overpromotion," they do not, contrary to defendant's assertion, equate these two concepts but rather refer to them as two separate bases for sustaining a finding of liability based upon inadequate warnings. The fact that both issues happened to be present in the two Califor-

nia cases does not mean that both *must* be present for either one to be submitted to the jury and did not preclude a charge to the jury in this case in terms of the "watering down" of warnings, even though the jury was not also charged with respect to overpromotion.

▮ Next, defendant objects that the issue of the adequacy of defendant's testing of the drug never should have been submitted to the jury. However, it is clear from the answer to Special Interrogatory I that the jury did not find the defendant liable because of any inadequacy in its testing. Thus, defendant's objection is entirely academic and does not impugn the jury's verdict. Nor in light of the answer to Special Interrogatory I can the defendant properly claim to have been prejudiced by the submission to the jury of the issue of inadequate testing.

Finally, defendant objects that the jury should not have been instructed in terms of the theory of products liability but rather in ordinary terms of negligence. In addition, defendant singles out from the charge as a whole various isolated phrases which defendant asserts implied that the drug was defective.

▮ In the leading Second Circuit case of *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 427 (2d Cir. 1969), the Court of Appeals held that where a plaintiff stated claims in both strict products liability and negligence, it was appropriate to charge the jury in terms of the strict products liability claim alone. That is precisely what the court did in this case. Further, the decision in the *Basko* case, Section 402A of the Restatement (Second) of Torts, and the New York doctrine of strict products liability set forth in *Codling v. Paglia*, 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973), all indicate that it is appropriate to discuss the strict products liability theory in terms of a "defect" in the product.[30] The *Basko* deci-

---

**30.** The court's statement, cited by the defendant in its moving Memorandum, that it did not think the analogy to a defective Pinto automobile was a favorable one to the defendant, was made in the context of a discussion of an entirely different issue than that here posed by the defendant and in no way suggests that plaintiff's claim was not appropriately ad-

sion does indicate that, because prescription drugs may be characterized as unavoidably unsafe, "the ordinary negligence concept of duty to warn," 416 F.2d at 426, is critical when a strict products liability claim is asserted against a manufacturer of drugs. And indeed, this court charged the jury in considerable detail on the defendant drug manufacturer's duty to give adequate warnings of the risks of its product and it was upon a finding that the defendant had breached that precise duty that a verdict of liability was returned against the defendant. But contrary to defendant's apparent suggestion, the *Basko* decision does not indicate that in every case involving injuries allegedly due to the ingestion of drugs the jury may properly be charged only in the language of negligence. *See also Ezagui v. Dow Chemical Corp., supra* 598 F.2d at 733, ("Although failure to warn sounds in negligence, New York courts have also held that inadequate warnings will render a product defective for purposes of . . . strict products liability.") Similarly, comment K to § 402A of the Restatement (Second) of Torts simply indicates the critical relevance in strict products liability cases involving drugs and other unavoidably unsafe products of the duty to warn and does not indicate that it is inappropriate in such cases to use the term "defect", a term used in the actual statement of the principle of that section.

It should be noted that in deference to defendant's expressed concerns at the precharge conference as to the connotations which the phrase "strict products liability" might convey to the jury, this court deleted from its instructions any mention of the word "strict" and termed the theory of plaintiff's action simply "products liability."

Most of the isolated phrases singled out by the defendant in this part of its motion as implying that its product was "defective" are simply references to the general dangers of a prescription drug which commentators, the court and even the defendant in its requests to charge assert are unavoidable. The court's instructions made it very clear that the jury was not to find liability against the defendant simply because of the existence of such general dangers, but rather was only to find the defendant liable if it found that the defendant had not given adequate warnings to the medical profession of dangers, including the dangers of CVA's, which the defendant knew or should have known to exist with respect to its drug and that the drug was, therefore, "defective" in that respect. Viewed as a whole, the court's instructions did not take away from the jury the issues either of whether Mrs. Lindsay's CVA was caused by the pill or whether defendant's drug was "defective" in terms of not being accompanied by adequate warnings of attendant risks.

Accordingly, this court finds no merit in defendant's assertion that miscellaneous errors in the charge to the jury require a new trial.

## X

In the tenth and final point in support of its present motion, defendant notes what it asserts are miscellaneous instances of the erroneous receipt of evidence requiring a new trial.

First, defendant asserts that the court should not have allowed Doctor Lederer, a toxicologist, to testify as an expert witness for the plaintiff. Toxicology, according to Doctor Lederer's preliminary testimony, is the science of studying the ad-

---

dressed in terms of a "defect" in the drug. As this court recalls the statement, which is not set forth at the page in the transcript noted by the defendant, it was made in response to an argument by defendant's counsel that the situation presented by the instant case was completely unlike the situation where it was necessary to send out recall notices to those who had purchased a certain automobile. The court's

remark was intended to question defendant's counsel's assertion of a complete difference between the automobile recall situation and the situation presented by the testimony and evidence in this case at that particular point and was meant to suggest that the substantive merits of defendant's case might not compare favorably with the automobile recall situation.

verse effects of chemicals and drugs on both humans and animals. Doctor Lederer testified to considerable background and credentials in that field. It was the determination of this court that Doctor Lederer's testimony as a toxicologist could be helpful to the jury in evaluating both the literature concerning the effects of oral contraceptives and the adequacy of defendant's warnings. The arguments advanced by defendant on the basis of the substance of Doctor Lederer's testimony properly go not to Doctor Lederer's competence and qualifications to testify as an expert witness in this case, but rather to the weight to be given Doctor Lederer's testimony by the jury, and were or should have been made in that context.

■ Next, defendant asserts that plaintiff should not have been allowed to introduce evidence regarding, or to refer in his argument to the jury to the profitability to the defendant of the drug here at issue. Evidence of the profitability of the drug to the defendant was relevant to show motive or reason for defendant's actions in allegedly watering down or minimizing its warnings of the risks of the drug and in allegedly failing to give adequate warnings of those risks in general. *See Love v. Wolf, supra,* 38 Cal.Rptr. at 189. The evidence elicited as to profitability was limited in scope and quantity and the references to that evidence in plaintiff's counsel's summation to the jury were not excessive either in length or tone so that it cannot be said that the probative value of the evidence of profitability was substantially outweighed by any prejudice to the defendant.

■ Finally, defendant asserts that the 1967 Patient Booklet (PX 208) should not have been admitted into evidence. As explained to the jury at the time, the Patient Booklet was admitted into evidence only on the issue of contributory negligence. Specifically, the jury was told that it could regard the Patient Booklet as evidence of what Mrs. Lindsay might or would have been told about the risks of the drug had she during the period between March 1968 and February 1970 returned to her pre-

scribing physician for an examination. The Patient Booklet was properly admitted for this narrow purpose. On his summation plaintiff's counsel specifically reminded the jury of the limited purpose for which the Patient Booklet had been admitted. Plaintiff's counsel's suggestion of a possible alternative use of the evidence could not have overcome the combined force of the court's limiting instruction and plaintiff's counsel's own reference to that limiting instruction.

Thus, this court finds no merit in defendant's assertion that miscellaneous instances of the erroneous receipt of evidence require a new trial.

For all of the reasons set forth above, defendant's motion for judgment notwithstanding the verdict, or in the alternative for a new trial is denied in its entirety.

SO ORDERED.